Irvixg H. Saypol, J.
This is a consolidated action for a declaratory judgment and incidental relief by a Nassau County bank against the Superintendent of Banks, two commercial banks, and eight savings banks with principal offices in New York City. At the close of the trial the complaint was dismissed against the Brooklyn Savings Bank because its status in the litigation had become academic.
After trial by the court, it is decided that the plaintiff may have judgment declaring that chapter 237 of the Lravs of 1960 is void and did not become a law because when it was called up for final passage on the night of March 21, or March 22, 1960, it was not on the desks of the members of the Legislature in final form, in violation of the Constitution of the State of NeAv York (art. Ill, § 14) and because the existence of the original *726 law in the archives and in the custody of the Secretary of State of New York is in doubt and unexplained, contrary to the provisions of sections 40, 41, 42 and 44 of the Legislative Law.
We are a government of law. Adherence to the rule of law needs more than lip service. The law-making process as well as those responsible for its maintenance and stability, Legislature, executive and judiciary, must be steadfast, going strictly and completely according to the supreme law, the Constitution. (Cf. People v. Devlin, concurring opinion of the court per Campbell, J., 33 N. Y. 269, 284.)
The plaintiff spears a multi-pronged assault against the validity of the so-called Omnibus Banking Bill, which is described officially as ‘ ‘ An act to amend the banking law, in relation to bank holding companies ” (official vol., L. of N. Y., 1960, ch. 237).
The plaintiff’s attack proceeds on three broad grounds. The first two are rejected at the outset and require no extended discussion. It is alleged that the Governor was disqualified for ethical reasons because of conflict of interest (Public Officers Law, § 74), which compels judicial invalidation of his message of necessity (N. Y. Const., art. Ill, § 14) and subsequent approval of the bill (N. Y. Const., art. IY, § 7), in effect, knocking the props from under this law. There is nothing in the cited statute authorizing such judicial invalidation. Moreover, the Governor’s law-making powers are in a field beyond judicial inquiry as to his reasons or personal motives. This is the well-established law based on the recognized coequal stature of the three branches of the government. The principle forbids judicial trespass on the executive as part of his constitutional law-making power (Fletcher v. Peck, 6 Cranch [10 U. S.] 87, 130-131; Kittinger v. Buffalo Traction Co., 160 N. Y. 377, 389; People ex rel. Wood v. Draper, 15 N. Y. 532, 545; 4 Wigmore, Evidence [3d ed.], § 1350, p. 701, “ The Constitution may provide that no legislator shall take a bribe, but an act would not be treated as void because the majority had been bribed”; cf. 2 Story, Commentaries on the Constitution of the United States [5th ed.], § 1090, p. 37). The plaintiff cites two recent decisions dealing with conflict of interest, United States v. Mississippi Val. Co. (364 U. S. 520) and Baker v. Marley (8 N Y 2d 365). Neither is apposite; in both cases, applicable statutes affected the interested official’s participation in the realization of the result which was stricken down by the courts. . This subject of conflict of interest of those in government is a matter currently much discussed (Conflict of Interest and Federal Service, Assn. of Bar of City of N. Y., Spec. Com. on Fed. Conflict *727 of Interest Laws, 1960). Its importance and the need for a high and rigid standard of conduct here is not overlooked, understated, minimized, nor gainsaid. Yet at times the demand for purity in public officials, like Caesar’s wife, seems to be strained to absurd lengths, to the point of forgetting entirely the acceptance of basic personal integrity and honor in public officials. Are we at the point of prescribing pocketless shrouds and fluoroscopic search of public officers, arriving and home-going, to detect contraband, as is imposed on visitors to jails? The report of the Bar Association (op. cit., p. 16) excludes consideration of the President and Vice-President as individuals, because their offices are deemed unique. The role of the Governor is close enough to be analogous. His responsibility is to the People; the court will not invade the political arena (Matter of Donnelly v. Roosevelt [Walker], 144 Misc. 525, 532).
The next branch of the plaintiff’s attack on the validity of chapter 237 of the Laws of 1960, alleges a multiplicity of substantive constitutional infirmities, both Federal and State, i.e., Federal pre-emption of the field, impairment of contract, equal protection of the laws, lack of due process, invalid special and local legislation, etc., etc. Those claims need not be detailed. Issues of constitutionality should not be decided before they need be if the record presents some other ground upon which the case may be disposed of (Matter of Peters v. New York City Housing Auth., 307 N. Y. 519, 527), especially by a trial court.
The final and controlling issue is the practical one of whether or not chapter 237 of the Laws of 1960, ever became a law. The problem is unusual though not one of first impression. It needs a circumspect and discriminating consideration of applicable constitutional and statutory provisions, preliminarily whether those are conclusive or presumptive, mandatory or directory, to set out the boundaries of judicial inquiry into the legislative function and then, to determine the resulting effect on the law as valid or invalid. Both sides cite abundant impressive precedental authority; both sides say of each other’s authority that it is mostly inapposite dicta. The defendants say the field is inviolate and concluded and beyond judicial inquiry. The plaintiff argues that the command of the Constitution is peremptory, that the evidence (here conditionally received, subject to reserved rulings on admissibility) establishes invalid passage of the law and an unexplained confusion of the course and destiny of the bill as a law so as to oust the law presumptively passed and enacted. Two caveats are observable, first to note the evolution of the wording of the Constitution as it now reads in section 14 of article III, being careful to distinguish the *728 context of its antecedents when discussed in judicial opinions. (Particularly, before and after 1894.) Second, to be mindful of the distinction in consideration, first, while the bill was in the Legislature and then its aftercourse and fate. There is no doubt that the field of inquiry in the latter respect is much broader, the administrative conduct, only presumptively regular. Summarized, the defendants contend that there is no field for judicial inquiry, the legislative course is inviolate and concluded by the certificate of the legislative officers attesting the due passage of the bill. The plaintiff having the burden of proof, argues that the wording of the Constitution in its mandatory requirements commands an exception, thus opening the field to judicial visitation.
It is most helpful to read the discussion by Dean Wigmore, and his quotations from opposing judicial viewpoints, as an introduction to the subject under review. While the discussion of the author is addressed to the enrolled bill, vis-á-vis the journal, to support or to contradict each other, together with the quoted decisions it enlightens the whole subject. While Dean Wigmore’s position is opposed to contradiction of bill or journal by parol, as will be seen, decision here is to the contrary. (4 Wigmore, Evidence [3d ed.], Rules of Conclusive Testimony, p. 683 et seq.)
§ 1350. Same: (2) Enrolled Copy of a Legislative Act; may the Journals override it? After a proposed bill has been reported, amended, read on different occasions, passed by the originating House, sent to the other House and there dealt with in the same way, the document thus enacted into a statute consists of one or more sheets of the original paper [the bill here] together with other writings or printings [the journal here] containing the tenor of the various legislative dealings with them. This complex, representing the net result of those dealings, is then copied out as a single document, and is signed by the presiding officers of each House, [the certificate here, Legislative Law, •§ 40] in England also by the Great Seal, and in the United States usually by the Governor or President, and sometimes by a Secretary, thus becoming the act as passed. This “ enrolment,” was by English practice deposited in Chancery, but is in American practice [except. for the journal] usually deposited with the Secretary of State. When the precise terms of the act, or the legislative proceedings affecting its validity, are in issue, is this enrolled copy conclusive?
(1) It seems clear, at the outset, that the enrollment is only somebody’s certificate and copy, because the effective legal act of enactment is the dealing of the Legislature with the original document, i.e. the “viva voce’’ vote. The Legislature has not dealt by vote with the enrolled document; the latter therefore can be only a certificate and copy of the transactions representing the enactment. The enrollment is thus not a record in the sense of a judicial record, i.e. the act done in writing (post, § 2450).
(2) Furthermore, it is clear that the legislative journals are not the original enactment, for the “viva voce” vote is not given upon them. They are but official statements of what has been done at a prior time, although the House *729 may have heard them read and approved them as correct. Thus, the question whether the enrolled copy shall be conclusive as against the journal is only a question whether an official report and copy of one degree of solemnity and trustworthiness is to be preferred against another of a less degree.
(3) On the other hand, it is well settled that the enrolled copy cannot be shown erroneous or valid by any other testimony than that of the journals,— for example, by the oral testimony of a member as to the number of votes or readings, or the terms of an amendment or a draft bill. Furthermore, it is equally conceded on all hands that the journal cannot be shown erroneous by similar testimony.
With this preliminary survey of the limits of the problem, we are in a position to consider the question whether the copy enrolled under the hands of the presiding officers authorized thereto is conclusive in every sense, so as to exclude contradiction by the testimony of the official journal.
The arguments in favor of allowing the journals to he consulted for that purpose are sufficiently stated in the following passage, and in the succeeding quotations dealing with the answers to them:
1852, Murray, C. J., in Fowler v. Pierce, 2 Cal. 165, “If such matters cannot be inquired into, the wholesome restrictions which the Constitution imposes on legislative and executive action become a dead letter, and Courts would be compelled to administer laws made in violation of private and public rights, without power to interfere. The fact that the law-making power is limited by rules of government, and its acts receive judicial exposition from the Courts, carries with it, by implication, the power of inquiring how faith ose exercising the law-making power have proceeded constitutionally 3 3 3 It is said that parties would in every case dispute the existence of the law, and that such practice would lead to confusion and perjury. I have already said that this is a question for the Court. And why should not the citizen whose life, property, or liberty is made forfeit by the operation of a particular law, he allowed to show to the Court, if it is not advised of the fact, that the same was passed in violation of his constitutional rights, or that it has been placed among the archives of government by fraud or mistake, and never had a legal existence? Is there no way of ascertaining whether the approval of the executive was forged, or whether officers have acted contrary to their constitutional obligations? It is no sufficient answer that we must rely on the integrity of the executive or other officers, and that the record of facts is conclusive evidence óf the truth of such acts. Our notions of free institutions revolt at the thought of placing so much power in the hands of one man, with no guard upon it but his own integrity; and our Constitution has wisely so distributed the powers of government as to make one a check upon the other, thereby preventing one branch from strengthening itself at the expense of the coordinate branches and of the public. Such evidence should be of the most satisfactory character; and there is less to be apprehended from the subornation of witnesses, subject to the tests which the law imposes, than from the exercise of so great a power without restraint or accountability.”
The answers to these arguments are represented in the following passages, dealing in various ways with one or more of the forms of argument against the conclusiveness of the enrolment:
1841, Nelson, C. J., in Hunt v. Van Alstyne, 25 Wend. 605, 610: “ There are only two modes of contradicting it [the certified enrolment] : 1. By the journals of the two Houses, and 2. by parol testimony. The presiding officer had all the benefit of the first; the ayes and noes are taken, and the journal made up, under his supervision and control. His means of ascertaining and determining the fact, when he declares the law to be passed, exceed those *730 of any other tribunal that might be called upon to inquire into it. Besides, the hurry and looseness with which the journals are copied, and the little importance attached to the printed copies, necessarily impairs confidence in their correctness. They are most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions. As to the second mode of contradicting the certificate, the evidence would if possible be still more fallible and unsatisfactory. Indeed, we can scarcely imagine a case where from its nature the proof would be so subject to the doubtful and conflicting recollection of witnesses. Nothing short of absolute necessity could justify a resort to it. It would hardly deserve much weight in contradicting the journal itself,— much less the certificate of the presiding officer affixed to the law.” [Obiter dictum, pp. 610-011.]
Dean Wigmore continues (p. 702) : “ The truth is that many have been carried away with the righteous desire to check at any cost the misdoings of Legislatures. They have set such store by the Judiciary for this purpose that they have almost made them a second and higher Legislature. But they aim in the wrong direction. Instead of trusting a faithful Judiciary to check an inefficient Legislature, they should turn to improve the Legislature. The sensible solution is not to patch and mend casual errors by asking the Judiciary to violate legal principle and to do impossibilities with the Constitution; but to represent ourselves with competent, careful, and honest legislators, the work of whose hands on the statute-roll may come to reflect credit upon the name of popular government.”
These questions then emerge: Can the Journal be examined, if so, to what extent and to what effect? Is the Journal conclusive? Will parol testimony be received to impugn the certificates of the legislative officers and the bill under review?
Writers strongly argue for legislative immunity from judicial interference in procedural aspects of legislating (Abernethy, Constitutional Limitations on the Legislature, Governmental Research Series No. 20, University of Kansas, 1959; Lloyd, Judicial Control of Legislative Procedure, 4 Syracuse L. Rev., 6, 1953). Wigmore (op. cit., Supp. 1959, § 1350) cites the Iowa case of Carlton v. Grimes (237 Iowa 912, 922) for the same proposition. Judge Potter in the first of the two opinions of the Court of Appeals in People v. Devlin (33 N. Y. 269, 280, 281, supra) says that we have no common law in this country in conflict with the proposition that the field of inquiry is restricted. ‘ ‘ It would be destructive not only of all public confidence, but would open a wide door for litigation, if our statutes, published by public authority, were liable to be annulled or impeached by issues of fact to be raised either of fraud in procuring their passage, or in lack of conformity to rule, by either house in the usual forms of enactment. If the defense interposed in this case, that no such statute exists, can be made available, and such questions as questions of fact can be brought into the courts for trial, an intolerable condition of legal uncertainty would result. Such a case is unheard of; it is too dangerous *731 in its consequences to be entertained as an experiment. It is without authority as a precedent” (pp. 281-282).
This was written in 1865. Judge Potter cites and quotes Chief Justice Marshall in Fletcher v. Peck (6 Cranch [10 U. S.] 87, supra) in support of the limitation on the court’s power to inquire into the record. Yet, on the other hand, Chief Justice Marshall indicated that the rule was not inflexible when he wrote in Fletcher v. Peck (supra, p. 126): “ The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.” Judge Campbell, who wrote the second opinion of the court in People v. Devlin (supra, p. 284) says, too, with supporting citation of authorities, 11 As both legislature and courts are restricted by the Constitution, which is the suprema lex when there is a violation of that supreme law by the law making power, the court may declare such violation” including resort to the record for some purposes in its inquiry. In People v. Supervisors of Orange County (17 N. Y. 235) the court quoted with approval Chief Justice Oaklet in Sun Mut. Ins. Co. v. City of New York (5 Sandf. 10) supporting judicial examination of the authority of the Legislature to pass a law. Lloyd (op. cit. 4 Syracuse L. Rev. 6, 7), opens his article, recognizing the relative roles involving power of judiciary and Legislature:

A Problem of Proof

Since the decision in Marbury v. Madison [1 Cranch (5 U. S.) 137] it cannot be questioned that all legislation, to be valid, must be enacted in conformity with the Constitution. Neither can it be questioned that under the doctrine of judicial supremacy, founded upon that ease, it is within the power of the courts to determine the constitutional validity of legislation with respect to both substance and procedure, and to invalidate a legislative enactment which is the product of procedure which does not fulfill constitutional requirements. When the due enactment of a statute is challenged, therefore, it will be in a judicial proceeding in which the issue becomes one of fact conformity or non-conformity to constitutional procedural requirements. Thus, the problem is reduced to an evidentiary question: by what proof is the fact to be established?
What is the best evidence of compliance with constitutional mandates? Original evidence, such as photographs of aye and nay votes on voting machines, *732 dictaphone records of the reading of bills and roll calls, with proper verification of the authenticity of such records, is not available because of the manner in which legislative business is conducted. The evidence available to the courts is limited to: (1) the enrolled bill — a bill which has been passed by both houses of the legislature, signed by the presiding officers thereof and by the governor, and filed with the secretary of state; (2) the journals of the two houses, in which their activities are recorded; (3) relevant, competent, material factual evidence, oral or written, official or unofficial. From these sources the factual issue must be resolved. When they are inconsistent the court must accept one or another, or some combination of the three as establishing the fact.
Sutherland, in Statutes and Statutory Construction ([3d ed.], vol. 1, § 705, n. 2) states “ In those jurisdictions where the constitutional provision concerning procedure is considered mandatory, the courts will, of course, consider the question of compliance. See infra, § 1315. ” Unfortunately, upon examination one finds that there is no section 1315 in the book. At pages 230-231 (§ 1405, the extrinsic evidence rule) the writer speaks of the evolving tendency to enlarge the area of inquiry to assure that constitutional requirements have been met. In the 1960 Cumulative Supplement, under the same section 1405, there is quoted from Bull v. King (205 Minn. 427, 430 [1939]) “ The ‘ enrolled bill rule ’ permits bills to become laws which have not been actually passed by the legislature. The rule has been said to be conducive to fraud, forgery, corruption and other wrongdoings in connection with legislation. Courts applying such a rule are bound to hold statutes valid which they and everybody know were never legally enacted.” Minnesota has no mandatory provision in its Constitution, yet it has rejected the Carleton v. Grimes doctrine in State ex rel. Foster v. Naftalin (246 Minn. 181).
The terms of a written Constitution if plain, clear and unambiguous, conveying a distinct meaning, will not be extended by implication. (Settle v. Van Evrea, 49 N. Y. 280.)
A constitutional provision should not be so construed as to work a public mischief, unless its language is such that no other course is open to the court. (People ex rel. Everson v. Lorillard, 135 N. Y. 285, citing Smith v. People, 47 N. Y. 330; People ex rel. Jackson v. Potter, 47 N. Y. 375; People ex rel. Killeen v. Angle, 109 N. Y. 564.)
In construing a constitutional provision, its history and the conditions and circumstances attending its adoption must be considered. (Sweet v. City of Syracuse, 129 N. Y. 316.)
The meaning of the words in a constitutional provision is to be reached in two ways: first, by ascertaining what the framers desired to guard against by the provision; and, second, by ascertaining the meaning of the words when applied to a statute by *733 writers and courts. (People ex rel. Lee v. Board of Supervisors of County of Chautauqua, 43 N. Y. 10, 14.)
The proceedings of the convention in which the Constitution was framed may be examined in considering the purpose of a given article or section. (Matter of Goedel v. Palmer, 15 App. Div. 86 [1897].)
Where in a new Constitution, an article relating to the same subject matter embraced in a provision of the former Constitution which has received judicial construction, is phrased in different language or qualified, it is presumed that the effect of the construction placed upon the former provision is intended to be avoided. (Matter of Smith, 90 Hun 568 [1895].)
Every presumption is in favor of the constitutionality of a statute. (Fort v. Cummings, 90 Hun 481 [1895].)
Statutes are presumed constitutional, and a court will only declare them void in a clear case. (Roosevelt v. Godard, 52 Barb. 533; People ex rel. Kemmler v. Durston, 119 N. Y. 569; Sweet v. City of Syracuse, 129 N. Y. 316, supra; People ex rel. Carter v. Rice, 135 N. Y. 473.)
Nor should a court declare a statute unconstitutional unless required by the most cogent reasons, or compelled by unanswerable grounds. (People v. Budd, 117 N. Y. 1, 13-14.)
The evolution of section 14 of article III traces from the first Constitution of the State of New York (1777), which provided:
‘ ‘ III. And whereas laws inconsistent with the spirit of this constitution, or with the public good, may be hastily and unadvisedly passed: Be it ordained, that the governor for the time being, the chancellor, and the judges of the supreme court, or any two of them, together with the governor, shall be, and hereby are, constituted a council to revise all bills about to be passed into laws by the legislature, and for that purpose shall assemble themselves from time to time, when the legislature shall be convened; for which, nevertheless, they shall not receive any salary or consideration, under any pretence whatever. And that all bills which have passed the senate and assembly shall, before they become laws, be presented to the said council for their revisal and consideration; and if, upon such revision and consideration, it should appear improper to the said council, or a majority of them, that the said bill should become a law of this State, that they return the same, together with their objections thereto in writing, to the senate or house of assembly (in whichsoever the same shall have originated) who shall enter the objections sent down by the council at large in their minutes, and proceed to reconsider the said bill. But if, after such reconsideration, two-thirds of the said senate or house of assembly *734 shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, and, if approved by two-thirds of the members present, shall be a law. ’ ’
The New York State Constitution of 1821, read as follows (art. I, § 12): “ Every bill which shall have passed the senate and assembly shall, before it become a law, be presented to the governor; if he approve, he shall sign it; but if not, he shall . return it with his objections to that house in which it shall have originated; who shall enter the objections at large on their journal, and proceed to reconsider it. If after such reconsideration two-thirds of the members present shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by two-thirds of the members present, it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the legislature shall, by their adjournment, prevent its return; in which case it shah not be a law. ’ ’
The New York State Constitution of 1846 contained the following (art. Ill, § 15): “ No bill shall be passed unless by the assent of a majority of all the members elected to each branch of the legislature, and the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays entered on the journal.”
Here, in 1894, there comes a turning point in the development of our Constitution when for the first time there was added the phrase “ or become a law”, thus imposing stated controls on legislative action as to the form and deliberation of bills. In 1906, Vajstk, J., in People ex rel. Hatch v. Reardon (184 N. Y. 431, 439), on solid ground, as will be shown by the sentiment of the Constitutional Convention of 1894 which wrote it, stated as follows: “ The object of this provision, which first appeared in the Constitution of 1894, is to prevent hasty and careless legislation, to prohibit amendments at the last moment and to secure more publicity than had been required before. Care was taken to provide for emergencies by a certificate of necessity from the governor, which authorizes immediate action. The *735 requirement is not directory, but mandatory, as is obvious from the form of the command, which prohibits a bill from becoming a law without compliance therewith. ’ ’
The President of the Constitutional Convention of 1894, Mr. Joseph H. Choate, in his acceptance speech on May 8, 1894, commended to the convention the need for remedial steps to regulate legislation to assure adequate deliberation by the Legislature and opportunity for consideration by the People (Rev. Record, Constitutional Convention 1894, p. 6). The bill in the convention which ultimately became section 15 of article III of the Constitution of 1894 upon its adoption by the People, was the product of debates participated in by such enlightened men as Mr. Elihu Root and Mr. Choate. They spoke in terms of imperatives, of requirements which would be mandatory, the word “ void ” was repeatedly used to assure that this would be the consequence of deviation from the prescribed mandate. The first debate started on June 21, 1894. (Rev. Record, pp. 479, 482, 483.) “ Its provisions must be strictly followed” (Rev. Record, p. 483). “ It says 1 thou shalt not ’ very emphatically ” (Rev. Record, p. 485). “ This says it shall not be a law unless you do certain things prescribed by the amendment”. (Rev. Record, p. 485.) Mr. Bowers: “ Indeed, the matter we are now considering is sufficiently serious to require us to get it into such shape that it will without doubt, accomplish the object sought to be reached”. (Rev. Record, p. 486.) There was an apprehension that, absent a precise declaration, a bill passed in violation might not be held void (Rev. Record, p. 487); courts would construe the restriction as directory. The proposal was described (Rev. Record, p. 489) as one, as important a proposition, as would come before the convention.
The bill was called up again on July 10, 1894, its provisions still directory, and debated (Rev. Record, pp. 670-677) upon the report of Mr. Vedder who read detailed letters of advice from leading jurists of the day regarding recommendations for the proposed wording of the amendment so that its requirements would unequivocally be recognized to be mandatory. Mr. Root accepted the amendment (Rev. Record, p. 676) and so the phrase “ nor become a law ” was inserted (Rev. Record, p. 677) in the two places in which it appears. On July 24 (Rev. Record, pp. 887-917), it was thoroughly debated and amendments discussed and finally adopted by the convention (Rev. Record, p. 917). Significantly, a thoroughly debated proposal by a delegate to include a provision regarding certification by the presiding officers of the Legislature, to make that mandatorily *736 conclusive too (like that now found in section 40 of the Legislative Law), was rejected by the convention (Rev. Record, pp. 906-915).
The phrase “no bill shall become a law ” is found in the Constitutions of 20 States of the Union. The Constitutions of South Carolina and Texas provide that ‘ ‘ no bill shall have the force of law ”. Vermont’s Constitution provides that “ No bill shall have the effect of, or be declared to be, a law ” (Constitutions of the States and United States, vol. 3, New York State Constitutional Convention Committee, 1938). Carlton v. Grimes (237 Iowa 912, supra) cited by Wigmore dealt with the Constitution of Iowa, its provisions directory only. Yet the court recognized the propriety of judicial inquiry where the Constitution commands.
The New York State Constitution of 1894, as adopted, thus became (art. Ill, § 15): “ [Manner of passing bills] No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage, unless the Governor, or the acting Governor, shall have certified to the necessity of its immediate passage, under his hand and the seal of the State; nor shall any bill be passed or become a law, except by the assent of the majority of the members elected to each branch of the Legislature; and upon the last reading of a bill, no amendment thereof shall, be allowed, and the question upon its final passage shall be taken immediately thereafter, and the yeas and nays entered on the journal.”
The debates in the Constitutional Convention of 1938, which preceded the adoption of the Constitution of 1938, were preceded by the Report of the New York State Constitutional Convention Committee (vol. 7, Problems Relating to Legislative Organization and Powers). In this report, at page 66, citing People ex rel. Durham Realty Corp. v. La Fetra (195 App. Div. 280) and People ex rel. Hatch v. Reardon (184 N. Y. 431, supra) appears the following comment in reference to the revision of the Constitution in 1894: “ This provision requiring bills to be printed and to be on the desks of members three days before passage is intended to be mandatory and to go to the validity of a measure. The courts have held that these requirements affect the constitutional status of a bill and are not curable by the Governor’s signature or his failure to sign a bill within ten days. These requirements can only be waived by the certification of the Governor attesting to the £ necessity of immediate passage ’
*737 The proceedings in the Constitutional Convention of 1938 (Rev. Record, Constitutional Convention of State of N. Y., 1938, vol. 2) dealt mainly with the provision relating to the exception by the use of the Governor’s message of necessity to avoid the three-day rule (Rev. Record, pp. 975-982) stressing also the presence of the bill in its final form, on the members’ desks before final passage. Senator Fearon addressing himself to the subject said in part (p. 975):
“We also thought that there was considerable criticism, rightly or wrongly, that in the closing hours of the Legislature, perhaps, or the closing days of the Legislature when these bills were passed under an emergency message, the bill in- its final form, as it would be voted on, was not- actually in the hands of anyone other than the two leaders of the body, with the original at the desk. * * *
“We thought * * * that the bill in its final form [on a message of necessity from the Governor] not necessarily printed but typewritten or mimeographed, ought to be on the desks. ’ ’
The late Governor Smith addressed himself to the subject, in part (Rev. Record, pp. 976-977):
‘ ‘ The history of this provision of the Constitution is this: Prior to 1894 there was nothing in the Constitution requiring a bill to be in its final printed form three days before passage.
“What caused the Convention of 1915 [sic, 1894] to put that into our Constitution? The fact is that on the closing day, I might say even in the closing hour of the Legislature, the Huckleberry Railroad in the Bronx got a franchise to lay down railroad tracks by an amendment to the religious corporations law [Laughter]. And the legislators got home only to find out the next day that that innocent-looking little amendment to the religious corporations law gave a company the right to operate a street railway in the Bronx. So the Constitutional Convention said,
“ ‘ We will stop that. We will provide that these bills must be in final form for three days, so that every legislator would be on notice of just exactly what is in the bill.’ ”
Governor Smith advocated that the whole final bill need not be on the desks of the legislators, that is to avoid reprinting the entire final form of the bill, but his idea was not accepted. The proposal was unanimously adopted (Rev. Record, pp. 1435-1436), adding the provision which mandates that in the case of an emergency message dispensing with the three-day rule during which the bill must lie on the desks in final form but *738 ‘1 it must nevertheless he upon the desks of the members in final form, not necessarily printed, before its final passage; ”.
The New York State Constitution of 1938, now in effect, reads (art. Ill, § 14): “ [Manner of passing bills; message of necessity for immediate vote.] No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage, unless the governor, or the acting governor, shall have certified, under his hand and the seal of the state, the facts which in his opinion necessitate an immediate vote thereon, in which case it must nevertheless be upon the desks of the members in final form, not necessarily printed, before its final passage; nor shall any bill be passed or become a law, except by the assent of a majority of the members elected to each branch of the legislature; and upon the last reading of a bill, no amendment thereof shall be allowed, and the question upon its final passage shall be taken immediately thereafter, and the ayes and nays entered on the journal.”
Legislative Law (art. 3, §§ 40-49) deals with the enactment and publication of laws. The pertinent provisions of the applicable sections are extracted, as follows: “ § 40. Certificate of presiding officer. Upon the passage by either house of the legislature of a bill * * * the presiding * * * officer * * * shall append to such bill * * * a certificate, to be signed by him, which shall disclose the date of its passage in such house, and whether passed by the votes of a majority of all the members elected to such house or of two-thirds thereof, or of a majority of such members, three-fifths thereof being present. In addition, if any such bill has been passed on a message required by the constitution, that fact also shall be stated, and if the message so specifies, the applicable portion of the constitution shall be identified. * * * No bills shall be deemed to have so passed unless certified in the manner provided by this section, which certificate to such effect shall be conclusive evidence thereof.”
The section imports by its last sentence an immutable effect to the certificate described, beyond contradiction or question.
This seemingly rigid provision in section 40 of the Legislative Law giving conclusive effect to the certificates of the presiding officers of the Senate and Assembly, nevertheless, has been construed as a rule of evidence, competent for the Legislature to adopt as such, but not a bar to foreclose inquiry to assure that the absolute mandate of the Constitution has been obeyed.
‘11 think this is largely owing to a failure to distinguish between the power of the Legislature to enact rules of evidence in gen *739 eral, where it is unrestricted by the Constitution, and its power to enact rules of evidence with respect to the proving the enactment of statutes where the Constitution itself prescribes how the vote shall be taken, how the number of members present shall be shown, and how the record thereof shall be made and preserved.” (Matter of Stickney, 110 App. Div. 294, 300.) In 1853, in People ex rel. Scott v. Supervisors of Chenango (8 N. Y. 317, 328), the court, per Willard, J., distinguished between directory and mandatory provisions of the Constitution in respect to legislation, the latter, it was said, when violated, presenting a defect of legislative power. On the question of interpreting the former language of section 40 of the Legislative Law (Act of May 12, 1847; L. 1847, ch. 253), wherein the certificate was declared to have presumptive, not conclusive, effect, as is now the case, the court stated at page 329: 11 The act of 1847 does not make the certificate or the want of one conclusive, but only presumptive evidence.” The court pointed out that the Constitution authorized no such conclusive effect, for that would be beyond the power of the Legislature and an arrogation of power.
So the expressed impregnable and inexpugnable conclusiveness of the certificate described in the statute, it is seen, is dissoluble, apparent rather than real, at least, when the question is one of fulfillment of the superior command of the constitutional prescription.
§ 41. Evidence of when bill becomes a law. If a bill becomes a law by the approval of the governor, the certificate of the governor shall be the evidence of the time when the bill becomes a law. '* *
§ 42. Deposit of laws * '* * with secretary of state. s' * * every bill upon its becoming a law * " shall be deposited [by the Governor] with the secretary of state. * * The secretary of state shall forthwith upon any such deposit indorse upon each bill his certificate of the day, month and year it was filed in his office, and his certificate to such effect shall be presumptive evidence thereof. The secretary of state shall cause the original laws *' passed at each session to be bound together in a volume of convenient size to be kept in his office. He shall compare with the original a volume of the printed laws * * *.
§ 44. Printing of session laws. The secretary of state shall annually cause the session laws to be printed in a bound volume * * “ explanatory matter shall be omitted. There shall be inserted immediately under the title of the law, a statement to the effect that it became a law upon the properly specified date, with * i,:' * the approval of the governor * * * and adding the words “passed by a majority vote,” “passed by a two-thirds vote,” or “passed by a majority vote, three fifths being present,” and if passed on a message required by the constitution, that fact also shall be stated, and, if the certificate so specifies, the applicable portion of the constitution shall be identified, in accordance with the certificates appended to the original bill. s o <guc;h. statement shall be presumptive evidence that the original law was certified by the presiding officer of each house accordingly.
*740 The treatise in McKinney’s Consolidated Laws of New York, Book 1, Statutes, (1942), on construction and legal interpretation, states the following outline and rules:
II. Formalities oar Enactment and Approval
See.
11. Legislative procedure generally.
12. Majority vote insufficient in certain eases.
13. Titles of Acts.
14. Approval of Governor.
15. Submission of laws to popular vote.
16. Proof of passage; time of becoming law; publication.
17. Adoption by reference.
§ 11. Legislative procedure generally
The general outline of procedure to be followed by the Senate and Assembly in enacting laws is laid down by the Constitution, and within this framework each house of the Legislature may determine the rules of its own proceedings. Thus the Constitution provides that no law of this state shall be enacted except by bill; that bills may originate in either house; that, having been passed by one house, they may be amended by the other; but that upon the last reading of a bill no amendments shall be allowed. After the final reading of a bill, also, the question of its passage is to be taken immediately, and the ayes and nays entered on the journal. Similarly the Constitution provides that no bill shall be passed in either house, unless it has been printed and upon the desks of the members, in its final form, for three legislative days. The Governor, however, may certify to the Legislature facts which, in his opinion, necessitate an immediate vote on a bill, in which case the bill need only be upon the desks of the members in final form, not necessarily printed, before passage. No bill can become a law except by the assent of a majority of the members elected to each branch of the Legislature, and the Constitution provides that the enacting clause of all bills shall be “ The people of the State of New York, represented in Senate and Assembly, do enact as follows.”
These, briefly, are the rules prescribed by the Constitution by which laws shall be enacted. Within them the Legislature has standardized its procedure so that bills in the process of enactment follow a more or less routine course. Any bill may be introduced in either house, and no preliminary finding or investigation is necessary to their introduction.
Upon being introduced, they are referred to a standing committee, and when reported therefrom either favorably or for consideration, they are referred, if Senate bills, to the Committee of the Whole. If they be Assembly bills they go to second reading. Having been considered by the Committee of the Whole, or on second reading, they are advanced to a third reading, then examined as to language and form by the Revision Committee, after which they are engrossed and ready for final consideration.
A bill passing its own house goes to the other branch of the Legislature, and takes the same course there as if it originated there, except that it may be substituted for an identical bill already on the. calendar, or, by unanimous consent it may be given immediate consideration and passed.
A bill may be reported either favorably or adversely by committee, or may be reported for the consideration of the house. If reported favorably it advances to the next order of business; if reported adversely and the house agrees to the report, the bill is dead; but if reported adversely and the house does not agree, it advances to the next order o'f business.
*741 A committee may be ordered to report a bill by moving to discharge the committee from further consideration of the bill.
Bills may be amended in committee, in the Committee of the Whole of the Senate, on second reading, or on third reading in either house. A committee may also report a bill with amendments for reprinting and recommittal. A bill having been passed by one house may be amended by the other, but such amendments must be concurred in by the house in which the bill originated before being transmitted to the Governor. The Revision Committee may amend a bill only as to its grammatical and legal form.
In the Assembly (but not in the Senate) the work of the committees is taken over, for the last ten days of the session, by the Committee on Rules, which makes up the calendars for the remainder of the session. The Committee on Rules of either house may amend a bill in any particular or may take a bill from a committee and place it immediately upon the order of final passage. By unanimous consent, also, or by a suspension of rules, up to the point of final passage, a bill may be progressed without regard to the regular order in either house.
Bills must be reprinted each time they are amended, and, with the exception already noted, they cannot be passed in final form in either house unless they have been upon the desks of the members for three legislative days.
The object of the three day requirement is to prevent hasty and careless legislation, to prohibit amendments at the last moment, and to secure publicity. It is sufficient that the bill has lain on the desks of the members of both houses for three days before passage by either. Thus a bill could be passed by the Assembly within two days after its passage by the Senate, where no amendments were proposed, and where prior to that time, it had been on the desks of the members of both houses for three days. The Governor likewise, as already shown, may dispense with this requirement entirely by certifying facts necessitating an immediate vote, and this notice is sufficient though given to the Senate alone, and not to both branches of the Legislature. The Governor’s certificate also identifies sufficiently the bill 'to be voted upon, despite the fact that after certification the bill is amended and its number changed. In such case the fact that the Governor subsequently approved the bill was evidence that the bill enacted was the one upon which he wished a speedy vote. * * *
While, generally speaking, a mode of legislative procedure prescribed by the Constitution is directory only, a positive provision that no bill shall become a law except upon compliance with a specified formality, is mandatory .and may not be disregarded. Thus it is said that the constitutional prohibition against passage of a bill until it has been upon the desks of the members for three days is obviously mandatory from the form of the command, since it prohibits a bill from becoming law without compliance therewith; and the provision that no law shall be passed except by bill precludes a concurrent resolution from, being a law or a statute. Rules of parliamentary procedure laid down by the Legislature itself would seem to stand on a different footing from those prescribed by the Constitution as respects their peremptory nature. Apparently, however, they are likewise mandatory, or, at least, when such rules have been determined, the Legislature may not depart therefrom and conduct its proceedings according to other rules unknown to the system adopted. When it is claimed that a procedural mandate of the Constitution has been violated the courts may go behind the printed statute book to examine whether the law was constitutionally passed; although there is a presumption from the promulgation of a statute that the formal requisites of enactment have been observed.
*742 These conclusions may now be stated as guides. The mandate of the Constitution (art. Ill, § 14) not only permits, it requires an examination into the procedure followed in the consideration and passage of the bill; the certificates of the presiding officers for that purpose are presumptive and not conclusive, the Legislative Journal likewise so, both to be considered as evidence together with the other usual forms employed in judicial investigation. The quoted provisions of the Legislative Law, it can be seen, by repeated expression, speak of but one bill, an original bill. Thus, section 40 speaks of a bill upon passage to which shall be appended the certificate of the presiding officer of each house. By section 41 that bill becomes a law at the time that the Governor so certifies it. The Secretary of State, pursuant to section 42, shall cause the original law to be kept in his office when it is received from the Governor with his approval. Finally, the Secretary of State shall publish the law, according to section 44 in accordance with the certificates appended to the original bill, and his statement of the details of its passage in compliance with the required constitutional dictates shall be presumptive evidence that the original law was certified by the presiding officer of each house accordingly.
These are the findings of fact and conclusions of law from the documentary evidence and the testimony of plaintiff’s witnesses, Senators Daniel G. Albert, William F. Condon, and Superintendent óf Banks G. Bussell Clark, and from defendants’ witnesses, Augustus Foleto, General Clerk of the Senate and Frank Campochiaro, Journal Clerk of the Senate. The defendants’ objections to parol or extrinsic evidence, received conditionally at the trial, are now overruled. Where photostatic copies of documents have been put in evidence, by agreement, they were offered and received as the originals. During cross-examination of Senator Condon, the defendants used an uncertified extract of the stenographic transcription of the Senate proceedings on the final consideration of the bill (pp. 97A-997). Senator Condon attested to its accuracy. The plaintiff objected to the defendants’ offer of the entire transcript, contending that only that part relating to Senator Condon’s participation should be admitted. The court, in discretion, overrules the plaintiff’s objection and the entire transcript remains in evidence as Exhibit B, not necessarily of the truth but of the fact.
The additional documentary evidence consists of two versions of the original of the final bill, one mimeographed and the other printed, each certified a month apart by the Secretary *743 of State as the original law which is on file in his office. To each hill is attached the identical certificate of the presiding officers of the respective houses of the Legislature, attesting due passage of the bill. Why there is more than one original law has not been explained. There is also the certified copy of extracts from the Senate Journal, relevant to the bill, the Governor’s message, a mimeographed version of the bill in final form, and a printed penultimate bill Print No. 4164 and a single legal cap sheet which is a carbon copy of the amendments made the final night.
The Journal shows that the bill was introduced in the Senate on February 17,1960, and assigned Introductory No. 3503. The first Print No. was 3753. On March 8, Mr. Hatfield, Chairman of the Committee on Banks, favorably reported the bill and it received its penultimate Print No. 4164. The following day, March 9, it was considered by the Senate in Committee of the Whole, reported favorably, which was agreed and ordered to a third reading. The Journal entries for March 21 portray haste and superficial, if any consideration. Print No. 4164 was called up for third reading. Instead of proceeding to debate and a final vote without further amendment (art. Ill, § 14, last cl.), Senator Cooke moved to recommit the bill to the Committee on Banks with instruction to report the six changes shown in the list (defendants’ Exhibit A). The material amendments provided a last-minute extension of branching privileges to resident savings banks between New York City and Westchester County and between Nassau County and New York City but not between Westchester and Nassau Counties. The legislation was the product of five years of study. Why savings banks were left out or why now put in is not shown. The reason is not subject to question, the unseemly haste evident. The important change was made by striking the number “one million” and substituting “seven hundred thousand” instead, in two places. The Journal entry recites that there was debate, and the motion was voted in the affirmative. Mr. Hatfield, the chairman from the said committee, reported the bill amended accordingly and it was ordered reprinted and placed on order of third reading.
Whether the bill, as Print No. 4164, when called up in the Senate on the night of March 21, was amended by the Committee on Banks, as shown by the Senate Journal, or according to the testimony at the trial, by the Senate in Committee of the Whole, is not clear. There is a conflict between the recitals contained in the various versions of the Journal, as so far discussed, and the final bill, mimeographed and printed. Senator Albert testi *744 fled that, however, it was before the Senate, the final amendments were moved, debated and adopted that night by the Senate, as such. Accepting this as inconsequential irregularity, despite the lack of any explanation, nevertheless their adoption produced a new and final Print No. 4563 for the bill. Thereupon became operatively effective the constitutional requirement of section 14 of article III, that “ No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage ”. Undeniably Print No. 4563 had not been printed. Obviously it could not have been on the desks three days. Seemingly there was objection. There was urgent need for passage. Chapter 31 of the Laws of 1960 which had been passed earlier in the session in connection with certain relevant banking situations was to expire that night and the bill under consideration was directed to prevent a gap in regulation in the banking field. Superintendent Clark’s request to the Governor resulted in the latter’s message of necessity for an immediate vote. When this issued, there became operative the further applicable clause in section 14 of article III to the effect that before Print No. 4563 could become a law, “ it must nevertheless be upon the desks of the members in final form, not necessarily printed, before its final passage ”.
The Journal includes the entire Governor’s message. Peculiarly, the message as originally typewritten for the Governor states its application to Print No. 4164 (the penultimate version), but that number is lined through, the final No. 4563 is inscribed in handwriting immediately, below the lined out number and below the substituted number there appear some illegible initials. This strange anomaly is unexplained as is the identity of the author of the initials and change. Singularly, even though unexplained, this too may be deemed inconclusive, perhaps cured by the Governor’s later approval of the final bill (People ex rel. Durham Realty Corp. v. La Fetra, 195 App. Div. 280, 286-287, supra, cited in McKinney’s Consolidated Laws of New York, Book 1, Statutes in section 11, it may be noted that in respect to the affirmance of People ex rel. Durham Realty Corp. v. La Fetra, by the Court of Appeals in 230 N. Y. 429, none of the issues of legislative procedure seem to have been argued nor are they discussed by the highest court). Defendants’ Exhibit B, reporting the Senate debate on passage after adoption of the final amendments on March 21, begins by referring to Print No. 4164 instead of No. 4563 as it should have if the final bill was before the Senate, and continues with the direction of the presiding officer, Senator Albert, to the *745 Secretary to read the Governor’s message of necessity as to Print No. 4563. The Journal shows that the bill was read and debated for the third time (the transcript shows only the last line of the bill was read), passed and sent to the Assembly for its concurrence. The last page of the Journal contains an entry of the return of Print No. 4563 by the Assembly with its message of concurrence, but again, strange and unexplained, the usual date stamp such as appears on every page, shows that the date originally appearing on this last Journal page was written over in hand and then both dates are obliterated. Digressing, at this point, the single certificate of the presiding officers certifying due passage shows a change in the date on the Senate portion. Originally it was rubberstamped ‘ ‘ Mar 22”, the Assembly certificate is stamped “Mar 21”, which would amount to an apparent reversal of the known sequence — first Senate, and then Assembly. The date “ Mar 22” is pen-lined through and another date stamped “Mar 21” appears above the original date. This is unexplained.
If this were all, the court would yet have grave doubts about trenching upon legislative prerogative. Even though many irregularities remain unexplained, the presumption of regularity is the starting point. But unexplained irregularity brings into play a rule of a shifted burden, applicable here as it is to later unexplained but more highly significant irregularity.
The court has indicated its conclusion that the inquiry to •ascertain if there was adherence to the fiat of the Constitution enlarges the field, it goes to the record and that includes consideration of extrinsic evidence. The principle expressed is not new, as has been shown. This is only the first occasion for its direct application. The extended introductory discussion is deemed necessary only because this is the first time that the duty to adhere to the Constitution is being enforced. Despite the impressive array of distinguished legal talent on behalf of the defendants, neither side has cited Judge Vaítít’s conclusion in People ex rel. Hatch v. Reardon (184 N. Y. 431, supra). It is too much, as has been demonstrated, to let the certificate mute the Constitution.
Senator Albert testified that he presided at the session the night of March 21, which began some time after 8:30 p.m. Unequivocally, he said, the final bill was not on his desk when he ascended the rostrum at 8:45 p.m. Plainly, it should not have been, because the then-existing final version of the bill had not been moved. It was while he presided that this took place, the last amendment approved by the use of a typewritten list of changes, not as a complete bill. The only inference which *746 is drawn is that this list of changes was the only available document used in conjunction with the penultimate bill Print No. 4164, in the possession of Senator Cooke. The list of the changes is found to have been the original of defendants’ Exhibit A which refers to Print No. 4164 pages and line numbers and cryptically recites the literal changes. Senator Albert testified that these amendments were not read, by sponsor, Secretary or clerk, and after adoption upon moving for a final vote, upon objection, it was laid aside. About an hour later, upon the delivery of the Governor’s message, the final proceedings ensued. Contrary to the defendants’ contention that the final bill in mimeographed form (plaintiff’s Exhibit 1, later approved by the Governor and filed with the Secretary of State) was on the members’ desks when they voted, Senator Albert testified it was not, and when shown plaintiff’s Exhibit 29, a duplicate of mimeographed bill plaintiff’s Exhibit 1, he repeated the denial and said that he saw it for the first time on the following day.
Senator Condon likewise testified that Print No. 4563 was not on his desk during the proceedings nor on that night and not until the next morning did he see one like plaintiff’s Exhibit 29. Significantly corroborative of this testimony, the court notices this brief extract from the transcript (defendants’ Exhibit B) of proceedings in the chamber during the final debate, after the bill had been finally amended and the Governor’s message received and the question of final passage taken up. At page 980, Senator Condon is quoted: ‘ ‘ tonight you offer amendments. Before they are printed, his Excellency, the Governor * * # gives a message of necessity ” (italics supplied). I do not credit the testimony of the General Clerk that in the course of the evening, pursuant to direction, he picked up and distributed mimeographed copies of the final bill like plaintiff’s Exhibit 29 to the Senators’ desks. Bearing in mind that Senator Albert ascended the rostrum around 8:45 p.m., that after amendment and an hour’s wait for the Governor’s message, the bill was then considered finally, it does not seem possible, at least it has not been offered in any way, that a 20-page mimeograph of several hundred copies could be produced in such a limited time.
I find that the final mimeographed version of Print No. 4563, Introductory No. 3503, certified by the Deputy Secretary of State on April 13, 1960, as the original law on file in his office, was not on the desks of the Senators when it was debated and voted upon on March 21, 1960, and in passing it, that senatorial performance was contrary to the mandatory provision of the *747 Constitution (art. Ill, § 14) and pursuant to that mandate the bill could not and did not become a law.
The concluding chapter in the fate of this bill suggests a chameleon metamorphosis. What began as the original mimeographed law has become a printed original in the officially prescribed repository, the office of the Secretary of State. There has been no explanation. Plaintiff’s Exhibit 1, the mimeographed version, found not to have been on the Senators’ desks, is 20 pages. Superintendent Clark described how he went with the bill’s sponsors to the Governor in the early morning, about 1:00 or 2:00 a.m. on March 22, when the Governor approved it. Written below the concluding text on page 20 is the Governor’s full signature, thus “ Nelson Aldrich Rockefeller below that is the rubber-stamped “Approved” and below that the date, rubber stamped “ Mar 22 1960 ”. According to Mr. Clark, the Governor used three different pens, one for each part of his full name, and awarded a pen to each of the sponsors and to Mr. Clark. Attached, as the last page, is the original certificate of each of the presiding legislative officers, the Senate certificate with the changed date which has been described (supra). In the upper right-hand corner of the certificate, the number “ 21 ” is written as the last page number of the bill.
Plaintiff’s Exhibit 37 is the second and later version of the original law supposedly passed and filed in the office of the Secretary of State, according to the certificate of the Executive Deputy Secretary dated May 13, 1960, a month after the first certificate. This bill is printed. Concededly no printed bill was on the desks of the members of the Legislature when they voted on March 21, 1960. This bill is 32 pages, the page numbers printed originally and duplicated by handwriting. Page 32, below the concluding text bears the Governor’s approval, too, but in different order. Here the Governor’s signature, as “Nelson Rockefeller” without the middle name “Aldrich”, appears last. Above that is the date 11 Mar 22 1960 ’ ’, and above the date the word ‘1 Approved ’ ’. The identical certificate of the legislative officers showing due passage of the bill which appears on plaintiff’s Exhibit 1, is now found attached to this later printed bill. It bears the identically written number “ 21 ” in the upper right-hand corner, but, additionally, the number “ 33 ” as the last page has been written twice. Which then is the original law that the Legislature passed and the Governor signed and filed? Nobody has said and nobody has explained. The notion that certificates by legislative officers of due passage of solemn laws affecting lives, property and welfare of the *748 people, are so inconclusive, is unacceptable. Presumptively effective the certificate may be considered, if not conclusive, but inconsequential it can never be. It needs ho finding that the form of the original law represented by plaintiff’s Exhibit 37 was never on the legislators’ desks. The fate of plaintiff’s Exhibit 1, already found not to have been there when voted, now is beclouded, deprived as it were of its birth certificate. Again unexplained, the rule calling for explanation has not been met by the defendants (cf. National Ulster County Bank v. Madden, 114 N. Y. 280, 286-287).
Chapter 237 of the Laws of 1960, being declared invalidly passed and not having become a law, the defendant banks are jointly and severally enjoined from opening, occupying and operating any branch office in Nassau or Westchester County. The defendant Gr. Bussell Clark, as Superintendent of Banks of the State of New York, is declared to have no legal authority or powers connected with or related to any application of any of the defendant banks or any other banks, addressed to his permission to open, occupy and operate a branch in Nassau or Westchester County. Settle judgment.