T. Paul Kaste, J.
Plaintiffs are four licensee race track operators which have commenced actions in Supreme Court, Albany County, against the New York State Off-Track PariMutuel Betting Commission, New York State Racing Commission, New York State Harness Racing Commission, City of Schenectady, and County of Rensselaer, and in one action the County of Greene, seeking a declaratory judgment that chapters 143 and 144 of the Laws of 1970 are unconstitutional and for an injunction restraining the implementation and enforcement of these statutes. The City of New York and the New York City Off-Track Betting Corporation moved to intervene as parties-defendant and that motion was granted.
The plaintiffs, the defendants (except the City of Schenectady "and County of Greene), and the intervenors-defendants, all have moved for summary judgment pursuant to CPLR 3212. A motion before this court is also pending by the same defendants to consolidate all actions into one pursuant to CPLR 602.
As to the motion to consolidate these actions it is obvious that they involve common questions of law and fact and accordingly should be consolidated. This motion is granted.
In attacking the constitutionality of chapters 143 and 144 of the Laws of 1970, known as the New York 'State Off-Track Pari-Mutuel Betting Law and the New York City Off-Track Betting Corporation Law, the plaintiffs have raised several constitutional issues. Each complaint alleges that the conducting of off-track pari-mutuel betting will deprive the tracks of property without due process and without just compensation; that the statutes impair plaintiffs’ charters and franchises, constituting an impairment of the obligation of contract in' violation of section 10 of article I of the United States Constitution; that the system of off-track betting is an unconstitutional and excessive exercise of the police power of the State; that the *948 system of off-track betting fails to provide reasonable revenue for the State, and that municipalities may not be permitted to participate in revenue received from pari-mutuel betting and in these respects violates section 9 of article I of the New York State Constitution; and that the statutes were not validly enacted into law pursuant to the requirements of section 14 of article III, of the New York State Constitution.
The answers of the defendants to each complaint deny the allegations of unconstitutionality and affirmatively allege that the statutes were enacted pursuant to the provisions of section 9 of article I of the New York State Constitution; that the plaintiffs are only permitted to operate their businesses of horse racing with pari-mutuel betting subject to regulation by the State; that the statutes are regulatory in nature and within the constitutional power of the Legislature; and that the statutes provide for reasonable revenue for the support of government and participation of municipal governments and such revenue is not prohibited by the Constitution. The answers further allege that the statutes were validly enacted pursuant to the requirements of section 14 of article III of the New York State Constitution.
In the first instance, the legal framework in which these motions must be decided should be commented upon. In view of the fact that summary judgments are sought, it is of course academic that if any one of these motions is to be granted, no material issues of fact can exist. It is also a fundamental principle that every presumption favors the constitutional validity of a legislative enactment (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 150; I.L.F.Y. Co. v. Temporary State Housing Rent Comm., 10 N Y 2d 263; Wiggins v. Town of Somers, 4 N Y 2d 215). The burden upon one attacking a statute as unconstitutional requires a demonstration of unconstitutionality beyond a reasonable doubt (Lincoln Bldg. Assoc. v. Barr, 1 N Y 2d 413; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537). These fundamental principles indicate that courts strike down legislative enactments as unconstitutional only as a last resort (Matter of Roosevelt Raceway v. Monaghan, 9 N Y 2d 293). As indicated above it is within this legal framework that these primary motions must be determined. It should also be noted that both of the statutes in question contain a separability clause in the event any part of the law is deemed invalid.
The off-track pari-mutuel betting laws were enacted purant to the provisions of section 9 of article I of the New York *949 State Constitution which provides in pertinent part as follows: “ except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling * * * except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state
Chapter 143 of the Laws of 1970 established the New York State Off-Track Pari-Mutuel Betting Commission and provided for a system of off-track pari-mutuel betting on races, expressly to derive from such betting a reasonable revenue for the support of government and to prevent and curb unlawful bookmaking and illegal wagering on horse races. The commission was authorized to establish and conduct systems of off-track pari-mutuel betting on horse races held within and without the State. The commission may itself operate a system of off-track betting or it may approve a plan under which a system may be operated by a participating municipality or by a public benefit corporation created to operate such a system in the municipality. In providing for a system of off-track betting, the statute authorizes a single pari-mutuel pool combining off-track and on-track bets on races conducted at tracks within the State. Section 69-a of the statute provides in paragraph (a) of subdivision 2 that the commission, municipality or public benefit corporation (whichever is operating the off-track betting system) may require the licensee track to provide it with appropriate space and/or facilities at its track for the transmission and reception of bets and racing information. Compensation to the licensee track is provided for in the amount of 1% of the single pool bets placed off the track in return for the use of facilities. If the licensee track and the commission cannot agree on the space and/or facilities to be provided or the terms and conditions of occupancy by the commission, the State Racing Commission or the State Harness Racing Commission (whichever has jurisdiction over the licensee track) shall make the appropriate determination, with the exception of the amount of consideration payable to the licensee track. Upon the issuance of such determination, the operator of the system shall be entitled to use and occupy the space or facilities whether or not the compensation to be paid by the commission has been agreed upon.
In the event that just compensation of the licensee track for providing space and facilities exceeds the compensation of 1% *950 of the single pool bets made off-track, the licensee track is entitled to recover the excess from the commission.
The amount of space and facilities to be provided at each track is not specified but is to be used for the transmission of details of off-track bets for inclusion in a track’s pari-mutuel pool and for transmission from a track to designated off-track betting facilities of odds, race results, winning ticket values and other information. A track operator must give notification of official results of each race to the commission, the cost of which is an expense to the latter. A track operator is required to include in the appropriate pari-mutuel pool all off-track bets transmitted to it, and these bets are included in the computation of the odds on each race and the amounts due the winning bettors. In the event that payments to winning bettors at a track exceed the portion of pari-mutuel pool attributable to bettors on the track, the commission must pay the net amount due to the track within 7 days after the race. On the other hand, the track operator must pay the net amount due to the Commission within 7 days after the race if the payments to winning bettors off-track exceed the portion of pari-mutuel pool attributable to such bettors.
The statutes further provide for reimbursement to licensee tracks for lost revenues from the operation of off-track parimutuel betting. To qualify for reimbursement in the event of a loss, a track must have maintained a quality of racing program equal to its program in 1969, subject to the limitations that reimbursement is allowed only for the years 1970 to 1975 and is not to be made to any track more than 50 miles from a participating municipality. Having otherwise qualified, a licensee track is guaranteed 90% of admission revenues of the year 1969 and 100% of its annual pari-mutuel revenues based upon the 1971 retained percentages. In terms of revenue to the State, a tax of % of 1% on all off-track pari-mutuel bets has been imposed. The amount of the tax is to be paid from retained percentages which amount to 17% of the pools on harness races and 16% on running races and steeple chases. The retained percentages are deposited in an expense and distribution fund from which are to be paid the expenses of operation and administration of off-track betting. Thereafter the net revenues up to two hundred million dollars are distributed 80% to the participating municipality and 20% to the State. Revenues in excess of two hundred million dollars are to be divided equally between the State and participating municipality.
*951 Plaintiffs contend that the off-track pari-mutuel betting laws are a nullity because they were not passed in conformity with section 14 of article III of the New York State Constitution. These bills were passed on a message of necessity from the Governor and it is plaintiffs’ argument that they could not become law unless the Governor set forth ‘1 the facts which in his opinion necessitate an immediate vote ”. What is suggested is that the adequacy and sufficiency of the Governor’s opinion should be evaluated and reviewed by the court. No such standard or test is provided by the Constitution and such an exploration into the substantive merits of the opinion would be, in my judgment, outside the realm of the judiciary. This is not to suggest, however, that judicial review has not or should not be had as to whether or not the procedural requirements have been met. The case relied upon by the plaintiffs (Franklin Nat. Bank of Long Is. v. Clark, 26 Misc 2d 724) involves strictly a procedural defect in that the bills had not been placed upon the desks of the members of the Legislature in final form prior to the vote. Such an occurrence violated one of the objects of this constitutional provision to prevent hasty and careless legislation (People ex rel. Hatch v. Reardon, 184 N. Y. 431).
The next argument advanced by the plaintiffs was also a constitutional one, to the effect that the off-track betting laws violate section 9 of article I of the New York State Constitution because that section permits only the State to derive revenue from pari-mutuel betting. This is not a new argument. It was presented by one of the plaintiffs herein in Saratoga Harness Racing Assn. v. Agriculture & N. Y. State Horse Breeding Development Fund, (22 N Y 2d 119, 122-123) and rejected by Judge Keating in the following language: “ The association ’s- contention is premised upon an erroneous reading of the constitutional provision. Exclusive of the 25% of ‘ breakage ’ involved here, harness racing is a source of substantial revenue (50% of ‘ breakage ’) for the support of government. There is nothing in the amendment which requires that all revenue in excess of expenses be devoted to the direct support of government or which prohibits the Legislature, as a condition to granting a license to a private racing association, from requiring that a certain portion of the revenues derived from racing be set aside for the general improvement of the sport and the facilities used.” It would appear that a scheme of reasonable revenue return is provided to the State in the off-track betting laws, and the fact that distributions to other entities are provided for does not constitute a violation of section 9 of *952 article I. Carrying this argument of plaintiffs to its -logical conclusion may in the end result prohibit-them and other private corporations from sharing in pari-mutuel revenues. In any event, the Saratoga case (22 N Y 2d 119, supra) defeats this constitutional objection of the plaintiffs.
The plaintiffs’ next contention is that the off-track betting laws violate the constitutional prohibitions against the taking of private property for public use without just compensation. Belated to this argument is another objection that these statutes are an invalid exercise of police power. Plaintiffs concede, however, that racing and betting are subject to legislative regulatory power and that it is within the power of the Legislature to pass laws designed to curb and prevent unlawful practices such as illegal bookmaking. The crux of this attack is that an unlawful taking cannot be justified under the police power clause. It is claimed that the provisions for compensation made by the statutes are constitutionally inadequate and that the tracks are deprived of their property without due process of law.
It is axiomatic that the State must pay “ just compensation ” for private property taken for a public use (U. S. Const., 14th Arndt.; 3ST. Y. Const., art. I, § 7). The thrust of the plaintiffs’ position in this regard is that while compensation has been provided for, it is both inadequate and ostensibly limited to tangible assets of the tracks. Assuming arguendo that the offtrack betting laws provide for a “taking” in the traditional sense, the next question would be whether or not the law provides for “ just compensation ” for that taking. At this point in time only the language of the statutes can be resorted to to answer this question, if in fact it bears of an answer presently. The statutes do not designate the size, amount or extent of space and facilities which a track must share with the commission, although one would be lead to believe that very limited space and facilities would be necessary to carry out the requirements of the law. While I consider it speculative and conjectural to deem the compensation just or unjust at this time, it would seem that a sound and reasonable effort has been made to compensate the tracks for the use of" the facilities and space.
I conclude that the passage of the off-track betting laws was a continuation of a valid exercise of police power of the State and a furtherance of the power and authority given to the Legislature over pari-mutuel betting on horse races by section 9 of article I. I consider the use of space and facilities at the tracks to be within the scope of the object and purpose of the legisla *953 tion and that the statute provides for an adequate opportunity to be heard on the subject of compensation (Fifth Ave. Coach Lines v. City of New York, 11 N Y 2d 342). In any event, if just compensation is a real issue, I hold that it is premature at this time.
It must be remembered that the plaintiffs are authorized to operate race tracks and conduct pari-mutuel betting, only pursuant to the authority granted under the Pari-Mutuel Revenue Law. This law provides a substitute for the prohibitions of such horse racing. The provision of section 9 of article I of the State Constitution legalizes horse racing with pari-mutuel betting, but only as may be prescribed by the Legislature. Implicit in this constitutional provision is the power within the State to discontinue pari-mutuel betting if it saw fit. Licenses were issued to the plaintiffs upon the express statutory condition that pari-mutuel betting would be subject to the supervision and to reasonable rules and regulations insuring that the public interest, convenience or necessity is served. In view of the fact that pari-mutuel betting is a totally regulated industry, it cannot be said that plaintiffs ’ franchises or charters carry any guarantees of futurity in the same form. Another industry with a similar history of regulation is the liquor industry which in recent years was subject to substantial changes regarding price controls. In the decision of the Court of Appeals in Seagram & Sons v. Hostetter (16 N Y 2d 47, 56) Judge Bergau stated: “ This change from a favored and protected profit position to a possibly sparse profit situation may make it economically difficult for the liquor industry. If it does it is within the competance of the New York State Legislature to make it that way. Even without article XXI of the Amendments to the United States Constitution, New York could end the liquor traffic within its borders entirely “A long history of regulation, control, price fixing place of time and sale setting, and outright extinction lies behind the liquor business in this country since Colonial times, and it is too late today to suggest that the rights of those who choose to engage in it are on a constitutional or legal parity with the rights of people who trade in bicycles, or cosmetics, or furniture.”
The regulation and control recently exercised in this parallel industry, as noted above, greatly exceed the degree of regulation and severity of control provided by the off-track parimutuel laws. With the apparent disadvantages to the tracks emanating from this new regulation and control, also stem the advantages of a new source of profit to the licensee tracks, *954 along with the reasonable return of revenue to the State. It is this partnership which has long existed in varying degrees. While the stated purposes of the law are twofold: to derive a reasonable revenue for the support of government, and to prevent and curb unlawful bookmaking, it is, essentially, a revenue-providing statute. There seems little doubt but that it will provide revenue; whether it-will prevent or curb bookmaking may be more difficult to establish.
Accordingly, defendants’ and defendants-intervenors’ motions for summary judgment are granted, and the motion of plaintiffs for the same relief is denied.