## Velasquez v. Depuy, Secretary of Revenue

*Theodore R. Mann* and *M. Melvin Shralow*, for plaintiffs.

*Edward I. Baker*, Deputy Attorney General, and *William C. Sennett*, Attorney General, for defendants.

KREIDER, P. J., February 27, 1969.—Plaintiffs, Antonia Velasquez and Milton J. Shapp filed a complaint in equity seeking, in count I, to restrain defendants, Warner M. Depuy, Secretary of Revenue of Pennsylvania and George E. Gold, Deputy Secretary, from enforcing Act no. 414, Session of 1967, effective January 1, 1968, which increased the rate of tax from five to six percent upon the sale and use in Pennsylvania of all tangible personal property as defined by the Act.[1]

In count I plaintiffs assert that House Bill no. 1672, Session of 1967, which ultimately became Act no. 414, was not passed by a constitutional majority of the members of the House of Representatives and that therefore Act no. 414 is void, despite the fact that the passage of the bill was certified by the Speaker and Chief Clerk of the House, the President Pro Tempore of the Senate and the bill was thereafter approved and signed by the Governor and lodged in the office of the Secretary of State.

Defendant-State officials filed preliminary objections to count 1 averring that the averments therein "do not present a justiciable issue cognizable in any Court," and plaintiffs filed an answer thereto.

In count II, plaintiffs also seek to restrain defendants from enforcing the "Tax Act of 1963 for Educa-

---

[1] The title of the original Selective Sales and Use Tax Act of March 6, 1956, P. L. (1955) 1228, was changed to the "Tax Act of 1963 for Education" by the Act of May 29, 1963, P. L. 49, sec. 2 (72 PS §3403-1).

As initially enacted, the tax rate was three percent. This was increased to three and one-half percent by the Act of April 15, 1959, P. L. 20, sec. 3, to four percent by the Act of August 20, 1959, P. L. 729, sec. 8, and to five percent by the Act of May 29, 1963, P. L. 49, sec. 7, 72 PS §3403-201.

tion," Act of May 29, 1963, P. L. 49, sec. VII, 72 PS §3403-201, which was amended by the said Act no. 414. They contend it is unconstitutional and void because it violates the Uniformity Clause of the Pennsylvania Constitution, Article IX, sec. 1, in that the act is in reality a tax on income at a graduated scale and therefore prohibited by the Constitution of Pennsylvania.

Defendants filed a demurrer to this count alleging that "It is insufficient in law and does not state a valid cause of action."

### AVERMENTS OF COUNT I

The alleged factual basis of count I of the complaint is found in paragraph 9 thereof:

"9. Said House Bill No. 1672 did not in fact become the law of the Commonwealth of Pennsylvania by virtue of the signature of the Governor of Pennsylvania to the purported Act No. 414 because said House Bill No. 1672 on final passage in the House of Representatives on December 15, 1967, received the votes of fewer than a majority of the members[2] elected to the House of Representatives as required by Article III, Section 4 of the Constitution of the Commonwealth of Pennsylvania, for the following reasons, inter alia:

"(a) One of the 102 votes required to be voted in favor of said Bill pursuant to said Article III, Section 4 was recorded to be voted as the affirmative vote of Representative Susie Monroe of Philadelphia, who was absent from the House of Representatives when said vote was taken and who was in fact opposed to the passage of said Bill.

"(b) At least four of the 102 votes required to be voted in favor of said Bill pursuant to said Article III, Section 4 were recorded as voted in favor of said Act in

---

[2] The House of Representatives, after it was redistricted by the Supreme Court of Pennsylvania, consisted of 203 members. See Butcher v. Bloom, 420 Pa. 305, 311, 344 (1966).

the names of members of the House of Representatives who were absent from said House of Representatives at the time of the voting on said Bill on December 15, 1967, by virtue of illness and/or hospitalization, to wit, Representative Robert J. Butera, Representative John T. Walsh, Representative Raymond E. Wilt and Representative Warren H. Spencer.

"(c) A number of other Representatives, the names of whom plaintiffs do not now know, whose votes were cast in favor of said Bill, were in fact absent from the House of Representatives when the vote was taken."

### Questions Presented For Decision

1. May an Act of the General Assembly which has been signed and certified as passed by the Speaker of the House and President Pro Tempore of the Senate and thereafter approved and signed by the Governor and deposited with the Secretary of State, be impeached by resort to extrinsic evidence of any sort?

2. Is the sales tax in question in reality a tax imposed on income at varying rates and therefore prohibited by the Constitution of Pennsylvania because it lacks uniformity?

### Discussion

Defendant State officials base their preliminary objections to count I of plaintiffs' complaint on the Enrolled Bill Rule which they say raises a *conclusive presumption* that House Bill No. 1672 was validly passed by the House of Representatives, as certified by the Speaker of the House and its Chief Clerk. The Bill purportedly received 102 affirmative votes, the minimum required to constitute a majority as prescribed by the Constitution of Pennsylvania. Defendants contend that since the President Pro Tempore of the Senate made a similar certification of the bill's passage and the Governor approved, signed and thereafter filed it in the office of the Secretary of State, the

courts are precluded by the Enrolled Bill Rule from going behind the bill, now Act no. 414, to determine by extrinsic evidence, *oral or otherwise*, whether in fact 102 members of the House were present and voted for the bill on final passage.

Plaintiffs' basic contentions as to count I are that the purported Act no. 414 is void because House Bill no. 1672 did not receive a constitutional majority of votes in its favor and that if construed so as to apply to plaintiffs, would result in the past, present and future subjection of them to excessive and illegal taxation, which they say has resulted and will continue to result in the taking of their property without due process of law, in violation of the Constitution of the United States and the Constitution of Pennsylvania.

Plaintiffs further contend that the Enrolled Bill Rule as applied in Pennsylvania relates *only to procedural matters* and not to cases where a bill failed to receive a constitutional majority and its subsequent certification of passage by the Speaker of the House was induced by fraud.

This appears to be a case of first impression in Pennsylvania. Neither plaintiffs nor defendants have cited a Pennsylvania decision factually in point and our independent research has disclosed none, although there have been somewhat similar cases in other jurisdictions to which we will refer later.

The constitutional provisions and rules of the House of Representatives relied upon by plaintiffs are as follows:

CONSTITUTION OF THE UNITED STATES

Amendment XIV.

". . . nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

CONSTITUTION OF PENNSYLVANIA

Article I, sec. 1

"All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

Article III, sec. 4

"Every bill shall be read at length on three different days in each House; all amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law, unless on its final passage the vote be taken by yeas and nays, the names of the persons voting for and against the same be entered on the journal, and a majority of the members elected to each House be recorded thereon as voting in its favor."

Article IX, sec. 1

"All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; . . ."

RULES OF THE HOUSE OF REPRESENTATIVES OF PENNSYLVANIA

"68. No member shall be permitted to vote and have his vote recorded on the roll unless he is present in the Hall of the House during the first call of the yeas and nays. . . .

"69.1(g) No member shall vote for another member, nor shall any person not a member vote for a member. . . ."

This case requires a determination of

WHAT EVIDENCE, IF ANY, IS ADMISSIBLE
TO SHOW FRAUD OR SERIOUS MISTAKE
IN THE PASSAGE OF A BILL BY
THE GENERAL ASSEMBLY?

Professor Lloyd in "Judicial Control of Legislative Procedure", 4 Syracuse Law J. 6, 7 (1952), discusses this question which involves the relative roles of the judicial and legislative departments of the government:

## "A PROBLEM OF PROOF

"Since the decision in MARBURY v. MADISON[3] it cannot be questioned that all legislation, to be valid, must be enacted in conformity with the Constitution. Neither can it be questioned that under the doctrine of judicial supremacy, founded upon that case, it is within the power of the courts to determine the constitutional validity of legislation with respect to both substance and procedure, and to invalidate a legislative enactment which is the product of procedure which does not fulfill constitutional requirements. When the due enactment of a statute is challenged, therefore, it will be in a judicial proceeding in which the issue becomes one of fact conformity or non-conformity to constitutional procedural requirements. Thus, the problem is reduced to an evidentiary question: by what proof is the fact to be established?

"What is the best evidence of compliance with constitutional mandates? . . . The evidence available to the courts is limited to: (1) *the enrolled bill*—a bill which has been passed by both houses of the legislature, signed by the presiding officers thereof and by the governor, and filed with the secretary of state; (2) *the journals of the two houses,* in which their activities are recorded; (3) relevant, competent, material factual *evidence, oral or written,* official or unofficial. From these sources the factual issue must be resolved. When they are inconsistent the court must accept one or another, or some combination of the three as establishing the fact."[4]

---

[3] 5 U. S. (1 Cranch) 137 (1803).

[4] Italics supplied.

In the instant case it is not necessary to consider the Journal of the House because there is no claim that it fails to comply with the speaker's certification. Moreover, in Pennsylvania an enrolled bill may not be impeached by Journal entries: Mikell v. Philadelphia School Dist., 359 Pa. 113, 125 (1948). However, we have examined a copy of the journal of the House of December 15, 1967, which is attached to defendants' brief and note that it records 102 votes in favor of the bill, that each of the five Representatives who allegedly was absent is recorded as present and voting in the affirmative, and as counsel state, "such Act was duly recorded without dissent or comment by the membership of the House of Representatives."

Dean Wigmore in his monumental work on evidence discusses the Enrolled Bill Rule in his usual able manner: IV Wigmore, Evidence (3rd ed.) sec. 1350, pages 683-702. Although section 1350 is entitled "Enrolled Copy of a Legislative Act; May the Journals Override it?", the exhaustive discussion and citation of cases supporting and opposing a conclusive presumption that an enrolled bill was validly enacted, are most helpful in the case before us. Dean Wigmore's firm conclusion is that despite its shortcomings, the Enrolled Bill Rule should be maintained: page 702.

Arguments against the Enrolled Bill Rule cited by Wigmore, p. 695, include an excerpt from Fowler v. Pierce, 2 Cal. 165 (1852), Murray, C. J.:[5]

"If such matters cannot be inquired into, the wholesome restrictions which the Constitution imposes on legislative and executive action become a dead letter, and Courts would be compelled to administer laws made in violation of private and public rights, without

---

[5] Reversed in Sherman v. Story, 30 Cal. 253, 89 Am. Dec. 93 Sawyer, J. See also Stevenson v. Colgan, 91 Cal. 649, 27 Pac. 1089 (14 L.R.A. 459); Taylor v. Cole, 201 Cal. 327, 257 Pac. 40 (1927).

power to interfere. The fact that the law-making power is limited by rules of government, and its acts receive judicial exposition from the Courts, carries with it, by implication, the power of inquiring how far those exercising the law-making power have proceeded constitutionally. .... It is said that parties would in every case dispute the existence of the law, and that such practice would lead to confusion and perjury. I have already said that this is a question for the Court. *And why should not the citizen* whose life, *property, or liberty* is made *forfeit* by the operation of a particular law, be allowed to show to the Court, if it is not advised of the fact, that the same was passed in *violation* of his *constitutional rights,* or that it has been placed among the archives of government by fraud or mistake, and never had a legal existence? *Is there no way of ascertaining* whether the approval of the executive was forged, or *whether officers have acted contrary to their constitutional obligations?* It is no sufficient answer that we must rely on the integrity of the executive or other officers, and that the record of facts is conclusive evidence of the truth of such acts. Our notions of free institutions revolt at the thought of placing so much power in the hands of one man, with no guard upon it but his own integrity; and our Constitution has wisely so distributed the powers of government as to make one a check upon the other, thereby preventing one branch from strengthening itself at the expense of the coordinate branches and of the public. Such evidence should be of the most satisfactory character; and there is less to be apprehended from the subornation of witnesses, subject to the tests which the law imposes, than from the exercise of so great a power without restraint or accountability."

To the same effect is the decision of the Supreme Court of Minnesota in Bull v. King, State Auditor, 205 Minn. 427, 430; 286 N. W. 311, 312 (1939):

"The rule which we follow is sometimes called the 'journal entry rule'. The attorney general urges us to abandon that rule and adopt the so-called 'enrolled bill rule,' under which the enrolled bill is *conclusive* as to the regularity of its enactment and the courts are precluded from examining the question. The basis of the rule is that the record of the enrolled bill imports absolute verity and that the rule is convenient in practice obviating inquiries such as the one now being made. *The rule is sustained by many courts of high authority*, including the Supreme Court of the United States. Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294. See 25 R. C. L., p. 895, §147. It is the rule in England. The King v. Arundel, Hob. 109. We considered the question long ago in Board of Supervisors of Ramsey County v. Heenan, 2 Minn. 330, 2 Gil. 281, and adopted the 'journal entry rule.' . . . The rule has the merit of preventing a bill from being accepted as law, which was not legally enacted.

"*The 'enrolled bill rule' permits bills to become laws which have not been actually passed by the legislature.* The rule has been said to be conducive to fraud, forgery, corruption and other wrongdoings in connection with legislation. *Courts applying such a rule are bound to hold statutes valid which they and everybody know were never legally enacted.* RODE v. PHELPS, 80 Mich. 598, 45 N. W. 493. While we recognize that the 'enrolled bill rule' is upheld by many authorities, the same must be said of the 'journal entry rule', which we follow and to which we adhere. The avoidance of the evils that might obtain under the 'enrolled bill rule' outweigh the argument in its favor."

Later decisions rejecting the Enrolled Bill Rule and adopting the Extrinsic Evidence Rule, which permits courts to go behind the Bill and determine by oral evidence or otherwise whether it was constitutionally enacted, are: Franklin National Bank of Long Island

v. Clark, Secy. Of Banking, 26 Misc. 2d 724, 212 N. Y. S. 2d 942 (1961) ; State v. Naftalin, 246 Minn. 181, 74 N. W. 2d 249 (1956), specifically rejecting Carlton v. Grimes (a leading case), 237 Iowa 912, 23 N. W. 2d 883 (1946) which readopted its former Enrolled Bill Rule.

*Arguments in favor* of the Enrolled Bill Rule are found in Wigmore at pages 695-702. Therein is a copious excerpt from the much quoted opinion of Chief Justice Beasley of New Jersey in Pangborn v. Young, 32 N. J. L. 29, 34 (1866)[6] and at page 701, a passage from one of Pennsylvania's leading cases on the subject, Kilgore v. Magee, 85 Pa. 401, 412 (1877) supra, which we shall discuss later.

In view of the high praise given by Wigmore to the opinion written by Justice Hoyt in State ex rel. Reed v. Jones, Atty. Gen., 6 Wash. 452, 34 Pac. 201 (1893) we quote from some of its relevant passages, pp. 204-205.

"But it is argued with great force on the part of the respondent that if the courts do not look into the proceedings of the legislature, and set aside laws when not enacted with the formalities required by the constitution, the legislature can at pleasure nullify all such provisions. This is no doubt true, and it is upon this line of reasoning that those courts which have gone behind the enrolled bill have justified themselves in so doing. *This line of reasoning seems to*

---

[6] At page 699, footnote no. 6, Wigmore says:

"The opinions by Hoyt, J., in State v. Jones, 6 Wash. 452, 34 Pac. 201, and Beasley, C.J. in Pangborn v. Young, 32 N.J.L. 29, are easily the best on the subject both for comprehensiveness and keenness of analysis and for clearness of exposition. The latter opinion is the one best known, but the former, though rarely cited, would alone render superfluous all the other deliverances on the subject. It is not quoted here, because it does not lend itself to partial quotation; but it ought to be read in its entirety by every one desiring to make an argument on the subject."

*assume* that the *judicial* department *is charged with seeing* that all the mandatory provisions of the constitution are complied with. But is this a reasonable construction in view of the theory of our government, and the principles enunciated in our constitution? Each of the three departments into which the government is divided are equal, and each department should be held responsible to the people that it represents, and not to the other departments of the government, or either of them. . . .

". . . Such being the respective duties of the several departments, it seems to us that the acts of each of them, when certified as required by the constitution, or by such a universal course of practice as to have the force of a constitutional provision, should be conclusive upon each of the other departments; and there would seem to be *no more impropriety in the legislature* seeking to *go behind the final record of a court,* for the purpose of determining whether or not it had obeyed the constitutional directions in making such a record, than there would be in the courts seeking to go behind the *final record* made by the legislative department.

"As we have seen, the executive, under the constitution, is charged with doing certain things upon certain contingencies happening, and under the constitution he is given no power thus to act excepting upon such contingency; *yet if the governor determines that such contingency exists,* and acts in pursuance thereof, no court, so far as we have been able to see, has ever sought to inquire into the fact as to whether or not the contingency upon which the governor had founded his action in fact existed. For instance, under the constitution, the governor is authorized to convene the legislature upon extraordinary occasions, and there would seem to be the same reason for a court refusing to give force to his proclamation thus

convening the legislature if upon investigation it found that the extraordinary occasion upon which the governor had assumed to act did not in fact exist *as there would be to go back of the record made by the legislature.*

"To preserve the harmony of our form of government it must be held that these several mandatory provisions are addressed to the department which is called upon to perform them, and that neither of the other departments can in any manner coerce that department into obedience thereto. Courts have gone behind the final records of the legislative department upon what seems to us a false theory. *They have assumed* that the mandatory provisions of the constitution are *safer* if the enforcement thereof is intrusted to the judicial department than if so intrusted to the legislature; in other words, they have acted upon the presumption that their department is the only one in which sufficient integrity exists to insure the preservation of the constitution. How the courts have obtained this idea is somewhat difficult to ascertain, but that they entertain it, and have allowed it to influence their decisions, is so evident that even a superficial examination of such decisions will satisfy any one of the fact. . . .

". . . Upon principle, then, in view of the division into departments under our form of government, each of *equal* authority, one department cannot rightfully go behind the final record certified to it or to the public from either of the other departments; and the judicial department is no more justified in going behind the final act of the legislature to see if it has obeyed every mandatory provision of the constitution than has the legislature to go back of the final record made by the courts to see whether or not they have complied with all constitutional requirements. If we investigate the question in the light of authority, and ana-

lyze the cases upon the subject in the light of the principle at the bottom thereof, it will be found that the overwhelming weight of authority is in favor of the proposition that courts will not go back of the enrolled bills on file in the secretary of state's office. . . ."

Sutherland, Statutory Construction, Vol. 1, sec. 1403 (3rd Ed. 1943, by Horack), does not agree fully with Dean Wigmore's vigorous endorsement of the Enrolled Bill Rule. The former states, at page 227:

". . . *the tendency today is* to avoid reaching results by artificial presumptions and thus it would seem desirable to insist that the enrolled bill stand or fall on the basis of the relevant evidence which may be submitted for or against it. *Nevertheless, a substantial number of states still follow the rule.*" Citing, inter alia, Kilgore v. Magee, supra, 85 Pa. 401 (1877).

However, the editor of Sutherland's Cumulative Supplement (1968) retreats somewhat from the original text. At page 101 (Supp.), section 1403, in referring to The Conclusive Presumption Rule, he says:

". . . *The intervening years indicate a reversal of that tendency.* See particularly, Carlton v. Grimes, 237 Iowa 912, 23 N. W. (2d) 883 (1946). On reconsidering the question in light of subsequent decisions the author believes that this is fortunate. . . . The opinion of the court in State ex rel. Cline v. Schricker, 228 Ind. 41, 88 N. E. (2d) 746 (1949) puts the point well '*the evils attending uncertainty* in ascertaining the statutory laws of the state *would far outweigh any benefits* which might be obtained by permitting an impeachment of the authentication of an act. If the members of the General Assembly violate their constitutional duties on adjournment, they can be defeated the next time such offices come up for election, but the remedy is not for the courts.'

" '. . . Public authority and political power must, of necessity, be confided to officers, who, being human,

may violate the trusts reposed in them. . . . It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments and correct or prevent abuses of their authority. It cannot authenticate a statute; that power does not belong to it; nor can it keep the legislative journal. . . . Human governments must repose confidence in officers. It may be abused, and there may be no remedy. Evans, Auditor v. Browne (1869), 30 Ind. 514, 526.' "

*To the contrary*, is the recent case of Franklin National Bank Of Long Island v. Clark, Secy. of Banking, 26 Misc. 2d 724, 212 N. Y. S. 2d 942 (1961). There, Justice Irving H. Saypol departed from the Enrolled Bill Rule (The People v. Devlin, 33 N. Y. 269, 280, 281) and received *extrinsic* evidence, *oral* and otherwise, to determine whether a bill had been constitutionally enacted. After finding that it was not, the court in a noteworthy opinion restrained the Secretary of Banking of the State of New York from carrying out the provisions of an Omnibus Branch Banking Bill which authorized banks in New York City and Brooklyn to establish branches in Nassau and Westchester Counties.[7] Since this is one of the decisions

---

[7] Subsequently the action was discontinued on stipulation with prejudice before judgment. Whereupon the Attorney General moved for an order vacating and annulling the decision of the court. In a memorandum Opinion denying the Motion and holding that the decision of the court would *not* be vacated, Justice Saypol stated:

"The Court cannot appreciate the presence of any logic on the sole supporting ground, viz.—that its decision may now be cited as a precedent. The court may not be affected thereby": Franklin National Bank Of Long Island v. Clark, Secy. of Banking, 217 N. Y. S. 2d 615 (1961).

relied upon by plaintiffs in the case at bar, we shall examine it in some detail.

The testimony disclosed that in violation of the New York State Constitution of 1938, no copies of the bill had been placed on the desks of the Senators before final passage. The court refused to credit the testimony of the General Clerk of the Senate that shortly before the final vote he had distributed mimeographed copies of the bill to the Senate. During the course of the testimony an extraordinary situation came to light which the Court described as follows, p. 964:

"The additional documentary evidence consists of *two versions of the original of the final bill,* one mimeographed and the other printed, each certified a month apart by the Secretary of State as the original law which is on file in his office. To each bill is attached the identical certificate of the Presiding Officers of the respective houses of the legislature, attesting due passage of the bill. Why there is more than one original law has not been explained. . . ." and at pages 968-969:

"I find that the *final mimeographed version* of Print Number 4563, Introductory 3503, *certified* by the Deputy Secretary of State on April 13, 1960, as the original law on file in his office, was not on the desks of the Senators when it was debated and voted upon on March 21, 1960, and in passing it, that *Senatorial performance was contrary* to the *mandatory* provision of the Constitution, Article III, Section 14, and pursuant to that mandate the bill could not and *did not become a law.*

"The concluding chapter in the fate of this bill suggests a chameleon metamorphosis. What began as the original mimeographed law has become a printed original in the officially prescribed repository, the office of the Secretary of State. *There has been no explanation.* Plaintiff's *Exhibit 1,* the *mimeographed version,*

found not to have been on the Senators' desks, is 20 pages. Superintendent Clark described how he went with the bill's sponsors to the Governor in the early morning, about 1 or 2 a.m. on March 22, when the Governor approved it. Written below the concluding text on page 20 is the Governor's full signature, thus

" 'Nelson Aldrich Rockefeller'; below that is the rubberstamped 'Approved' and below that the date, rubber stamped 'Mar 22 1960'. . . .

"Plaintiff's *Exhibit 37* is the *second* and *later version* of the original law supposedly passed and filed in the office of the Secretary of State, according to the certificate of the Executive Deputy Secretary dated May 13, 1960, *a month after the first certificate.* This bill is printed. Concededly no printed bill was on the desks of the members of the legislature when they voted on March 21, 1960. This bill is 32 pages, . . . *Here the Governor's signature,* as 'Nelson Rockefeller' without the middle name 'Aldrich', appears last. Above that is the date 'Mar 22 1960', and above the date the word 'Approved'. *The identical certificate of the legislative officers showing due passage of the bill* which appears on Plaintiff's Exhibit 1, is *now* found *attached* to this *later* printed bill. . . . *Which then is the original law* that the legislature passed and the Governor signed and filed? *Nobody has said and nobody has explained.* The notion that certificates by legislative officers of due passage of solemn laws affecting lives, property and welfare of the people, are so inconclusive, is unacceptable. Presumptively effective the certificate may be considered, if not conclusive, but inconsequential it can never be. It needs no finding that the form of the original law represented by Plaintiff's Exhibit 37 was never on the legislators' desks. The fate of Plaintiff's Exhibit 1, already found not to have been there when voted, now is beclouded, deprived as it were of its birth certificate. Again unexplained, the

rule calling for explanation has not been met by the defendants (cf. National Ulster County Bank v. Madden, 114 N. Y. 280, 286-287, 21 N. E. 408, 409).

"Chapter 237 of the Laws of 1960, being declared invalidly passed and not having become a law, the defendant banks are jointly and severally enjoined from opening, occupying and operating any branch office in Nassau or Westchester County. . . ."

Also at page 967:

"The court has indicated *its conclusion* that the inquiry to ascertain if there was adherence to the fiat of the Constitution enlarges the field, it goes to the record *and that includes consideration of extrinsic* evidence. The principle expressed is not new, as has been shown. This is only the first occasion for its direct application. The extended introductory discussion is deemed necessary only because this is the first time that the duty to adhere to the Constitution is being enforced. . . . *It is too much* as has been demonstrated *to let the certificate mute the Constitution.*"

Plaintiffs in the present case also rely on State ex rel. Mayr, Secy. Of State v. Marion Circuit Court, 202 Ind. 501, 176 N. E. 626, (1931), where they say the Supreme Court of Indiana faced an issue similar to the one before us. That case involved a bill to divest cities of the power of control over bus lines operating within them. The City of Muncie brought suit charging that the bill was "only a pretended act and that it appears in its present form as a result of a conspiracy of persons, and of fraud and mistake of fact in the procuring upon the enrolled act of the purported signatures of the President of the Senate and the Speaker of the House."

The State, acting through Mayr, Secretary of State, sought a writ in the Supreme Court to prohibit defendant Marion Circuit Court, from trying and deter-

mining the question whether the bill was genuine, or a false and fraudulent paper, and therefore void.

Subsequently defendant lower court filed as an exhibit to its return in the Supreme Court, the affidavit of the President of the Senate stating in effect that his signature had been obtained through fraudulent misrepresentations and mistake, and that such bill was never passed or approved by the Senate. The return also alleged that the Speaker of the House of Representatives, whose affidavit could not be obtained because he was at the time in Europe, signed the bill because it was represented and presented to him as being the bill that passed the House and the Senate and that he did not discover until later that it had never passed the Senate; and that the Speaker would not have signed the instrument had he known it had never passed or been adopted by the Senate. Both Houses of the Indiana General Assembly passed a resolution requesting the Governor to return the so-called bill but he declined to do so.

The Supreme Court refused to restrain the lower court from proceeding further and taking testimony, pp. 508, 509:

"We may grant that courts cannot look behind the bill to the legislative proceedings when the act is duly and lawfully attested, yet, when the very fact of the attestation of a bill is alleged to be due to fraud and mistake of fact or to have been recalled, we believe that the courts have the right and the duty to determine such questions. . . .

"The statements of courts referred to by relator, that the question of whether or not an act of the General Assembly is a part of the law is a question of law and not of fact were *not* made in direct and timely *proceedings* which *attacked* the *very signatures* relied upon to give validity to the acts. We cannot agree with relator that, in a cause like this, 'the courts cannot

. . . set the same aside for fraud or mistake.' In our opinion, the Marion Circuit Court has jurisdiction to hear and determine the equitable proceeding now pending before it."

Eighteen years after Mayr, another case came before the Supreme Court of Indiana: State ex rel. Cline v. Schricker, Governor, 228 Ind. 41, 88 N. E. 2d 746 (1949), in which plaintiffs challenged the validity of a number of House Bills involving proposed expenditures for various units and functions of government. They averred that the bills were invalid for the reason that each passed the General Assembly after the hour of 12 o'clock midnight Monday, March 7, 1949, which, under the Constitution of Indiana was the time of expiration of the regular session; that in fact the General Assembly did not adjourn sine die until 5:16 p.m. on Wednesday, March 9, 1949, which was a period of more than 41 hours longer than the time fixed by the Constitution; that the General Assembly stopped the clocks at 11:22 p.m. on March 7th and that they remained so until March 9th. The complaint further charged that the General Assembly by its officers and employes falsely and fraudulently made official entries in the journals showing the General Assembly adjourned sine die at 11:59 p.m. March 7, 1949. It was charged also that the presiding officers of each of the Houses falsely, *fraudulently* and wilfully attested and *certified* as to the genuineness of the Bills as having been passed by the General Assembly. The Supreme Court of Indiana dismissed the complaint stating:

"It is not necessary in this opinion to determine the effect of an act of fraud practiced upon the presiding officers who conceivably might authenticate as genuine a bill not in the words as duly passed. There is no contention here of *any such fraud* as was presented in State ex rel. Mayr, Secretary Of State v. Marion Cir-

cuit Court (1931), 202 Ind. 501, 176 N. E. 626." (Italics supplied.)

Mogilner v. Metropolitan Plan Comm., 236 Ind. 298, 140 N. E. 2d 220, 230, 231 (1957) and Welsh, Governor Of Indiana v. Sells, 244 Ind. 423, 192 N. E. 2d 753 (1963), emphatically declare that under the law of Indiana the validity of an Enrolled Bill may be questioned *only* for fraud. In the latter case, the factual situation was distinguished from the Mayr case, the court saying, p. 758: *"No fraud of that character is charged in this case."*

In the instant case the vote of each member of the House was electrically recorded and remained illuminated on a huge tally board where a green (yea) or red (nay) light opposite his name clearly disclosed to all members and spectators in the House how he had voted. It is worthy of note that when the final vote on House Bill no. 1672 was taken on December 15, 1967, following days of vigorous and spirited debate, *not a single member* made demand for a verification or recapitulation of the vote or challenged the official proclamation by the speaker that 102 members had voted in the affirmative and that the bill had passed, agreeably to the Constitution.[8]

It is difficult to understand why the opponents of the bill who had fought so hard against it and apparently lacked *only one* vote to defeat it, made no objection whatever when the five members alleged by the plaintiffs to have been absent were officially recorded

---

[8] ". . . The legislative majorities which allegedly had been deceived would have been in an optimal position to ascertain the true facts and to prevent or correct any inroads upon their power to decide. *Their acquiescence was, therefore, conclusive evidence that no such infringements had in fact occurred"*: Scharpf, "Judicial Review And The Political Question: A Functional Analysis," 75 Yale Law Journal (1966), p. 585, footnote 237; see also page 547, footnote 106. This is an exhaustive discussion of the subject.

as "present" and voting in the affirmative.[9]

Notwithstanding the unanimous acquiescence by the members of the House in the Speaker's pronouncement that the Bill had passed, reputable and knowledgable press correspondents who were in attendance, as well as editorial writers of leading Pennsylvania newspapers, together with columnists, radio and television news-commentators, promptly informed the public that in truth House Bill no. 1672 had failed to obtain a constitutional majority because the said five members recorded as voting "yea" were in fact absent when the vote was taken.

In their answer to defendants' preliminary objections to count I of the complaint, plaintiffs allege:

"C. Without any one of the above recited votes, House Bill 1672 could not be enacted into law in accordance with the Constitution of Pennsylvania.

"D. If the Bill was certified as having been passed by the House of Representatives, said certification was made with full knowledge of the Speaker of the House and the Assistant Majority Whip that votes were recorded for absent members contrary to the rules of the House of Representatives and the Constitution of Pennsylvania.[9a]

---

[9] It is common knowledge that before the vote, intense pressure was brought to bear upon the members of the House by many reputable groups, including representatives of schools, universities, hospitals, as well as many others whose asserted needs may not have been so urgent. Each group insisted that its demands be met and predicted dire calamity unless the proposed increased sales tax (the largest tax revenue producer in the Commonwealth) were enacted immediately. The effect of these incessant and harassing demands upon the Legislature and executive branches of the State Government is reflected in the brief of the defendants' counsel. Therein appears the ominous prophecy that "an adherence to the plaintiffs' position now *would effectively put the Commonwealth out of business.*"

[9a] Plaintiffs aver the Majority Whip, Mr. Butera, was confined in a hospital when the vote was taken.

"E. If the Bill was certfied, it was with full knowledge of the Speaker of the House of Representatives and the Assistant Majority Whip that said certification was false and fraudulent because in fact said Bill had not received the minimum number of votes, cast in accordance with law, required by the Constitution of Pennsylvania. . . .

"H. Said fraud as recited above was material in that it was intended to and did subvert the entire democratic process by causing to be certified a Bill which a majority of the legislators had not in fact approved."

Plaintiffs urge this court "to go behind the Bill" by requiring defendants to file an answer under oath and that the court thereafter take testimony to determine whether the said five members were present and voted for the bill. This brings us face to face with the Enrolled Bill Doctrine, the benefits and detriments of which we have outlined heretofore.

It is earnestly contended by plaintiffs that as citizens and taxpayers they have been defrauded and taxed illegally because of a false certification that the Sales Tax Bill in question was passed by a majority vote and that their *constitutional rights* as well as those of all other taxpayers similarly situated, were violated to their injury by such certification. We, therefore, shall examine the Enrolled Bill Doctrine in light of the controlling

## PENNSYLVANIA DECISIONS

The decisions of the Pennsylvania Supreme Court support the Enrolled Bill Rule.[10] One of the leading

---

[10] Rare exceptions to the Enrolled Bill Rule are found in Chalfont v. Edwards, 173 Pa. 246 (1896) where notice was not published in the locality which the bill affected, in violation of Article III, Section 8 of the Constitution, and in Commonwealth v. Purples Line Co., 18 D. & C. 504 (1933), Beaver Co., Reader, P.J., where legislation regulating the licensing of out of State motor vehicles violated Article III, Section 25 because it was not included in the Governor's proclamation calling the Legislature into Special Ses-

and most frequently cited cases is Kilgore v. Magee, supra, 85 Pa. 401 (1877), in which the parties were represented by counsel of national reputation. In a Per Curiam opinion the court reiterated the basic principles which are applicable in the instant case, p. 412:

"In regard to the passage of the law and the alleged disregard of the forms of legislation required by the constitution, we think the subject is not within the pale of judiciary inquiry. So far as the duty and the consciences of the members of the legislature are involved the law is mandatory. *They are bound by their oaths* to obey the constitutional mode of proceeding, and any intentional disregard is a breach of duty and a violation of their oaths. But when a law has been passed and approved and certified in due form, *it is no part of the duty of the judiciary to go behind the law* as duly certified to inquire into the observance of form in its passage. The presumption applies to the act of passing the law, that applies generally to the proceedings of anybody whose sole duty is to deal with the subject. *The presumption in favor of regularity is essential* to the peace and order of the state.

"If every law could be contested in the courts on the ground of informality in its enactment, the *floodgate of litigation* would be opened so widely, society would

---

sion. See also Taylor v. King, 284 Pa. 235 (1925) where the court sustained an objection to a proposed constitutional amendment and held it invalid since there had not been a five year hiatus between amendments on the same subject matter and therefore in violation of Article XVIII. In each of these cases the violation of law occurred outside the halls of the Legislature and could easily be determined by an examination of the statute or proposed Constitutional Amendment involved.

"The enrolled bill is *conclusive evidence* of the observance of the legislative procedure except in certain instances where the purpose of the regulation was to put interested people on notice. . . ." CONSTITUTIONAL REGULATION OF THE LEGISLATIVE PROCEDURE IN PENNSYLVANIA, Vol. 11, U. of Pitt. Law Rev. p. 677 (1950).

be deluged in the flow. It is not a question of fraud in which that is set up as a law which never was so in form or in fact, but a question of regularity in the conduct of those who have the power to enact the law, and who declare it to be such. *The evidence of a law —its actual existence—we may inquire into;* for before we are bound by it, we must be satisfied it is the act of the legislature, however informally they may have conducted the process by which they have made it a law." (Italics supplied.)

Mikell v. Philadelphia School Dist., 359 Pa. 113 (1948), 4 A. L. R. 2d 962, Anno. p. 976, is another noteworthy Pennsylvania decision dealing with the Enrolled Bill Rule. There plaintiff's principal contention was that the act in question was a revenue-raising measure which originated in the Senate instead of in the House of Representatives and was therefore violative of Article III, sec. 14 of the Pennsylvania Constitution. In rejecting that contention our Supreme Court held, p. 123:

" . . . inasmuch as the particular constitutional provision is merely directory, any failure to follow it in practice must be objected to timely. If that is done, as on a point of order, the objection would, of course, be efficient to block the passage of the measure. The members of the legislature are to be presumed to intend due respect for all constitutional requirements concerning the enactment of statutes. Such provisions, however, are *mandatory only* 'so far as the duty and the *consciences* of the members of the legislature are involved . . .' : Kilgore v. Magee, 85 Pa. 401, 412, where the presently material assault on the statute there involved was that 'It was not read at length on three different days in each or either house of the General Assembly' see Art. III, Sec. 4. [Italics added.]

"A failure of the legislature to follow a directory provision of the Constitution, respecting the introduc-

tion and passage of legislation, does not present a justiciable question, and, in no event, does it impair the validity of a duly certified enactment. In the KILGORE case, supra, this Court said at p. 412 that 'In regard to the passage of the law and the alleged disregard of the forms of legislation required by the constitution, . . . *the subject is not within the pale of judicial inquiry*. . . ." (Emphasis by the Supreme Court.)

The scholarly opinion in the Mikell case was written by Mr. Justice Charles Alvin Jones (afterwards Chief Justice), who also cited with approval Speer v. Plank-Road Co., 22 Pa. 376, 378, and the Federal cases heretofore mentioned: Field v. Clark, 143 U. S. 649, 680; Harwood v. Wentworth, 162 U. S. 547, 562 and Rainey v. United States, 232 U. S. 310.

In Mikell it was further stated, p. 124:

". . . 'The question of origin is not litigated frequently'. The reason for that, undoubtedly, is that in many States, as in Pennsylvania, after the enrollment of a duly signed and certified enactment, the courts will not go behind the face of the statute in order to search out and act upon a possible non-compliance, during its passage, with a purely procedural direction. Kilgore v. Magee, supra, is in point by close analogy. It was there held (p. 412) that '. . . when a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage.' And in Rainey v. United States, supra, at p. 317, the Supreme Court spoke to like effect that 'Having become an enrolled and duly authenticated Act of Congress, it is not for this Court to determine whether the amendment was or was not outside the purposes of the original bill.' "

And also at page 126:

"Moreover, the plaintiff concedes that the principle for which Kilgore v. Magee, supra, and Speer v.

Plank-Road Company, 22 Pa. 376, 378, stand is that 'the enrolled bill is the conclusive evidence of statutory enactment and no other evidence is admissible to establish that the bill was not lawfully enacted' and then immediately adds that 'This is the common law rule with which Sutherland [on Statutory Construction, 3rd Ed., Vol. 1, §1403, p. 225 et seq.] disagrees, but which appears to be the rule adhered to in a number of jurisdictions, including the Pennsylvania and Federal courts [citing cases]' "

The Mikell case was cited recently with approval in Upper Dublin Township Authority v. Piszek, 420 Pa. 536 (1966). There the Supreme Court of Pennsylvania in an opinion written by Mr. Justice Cohen, dismissed an attack on an eminent domain proceeding in which it was claimed that the taking authority was never properly formed and therefore without power to act. The court held that the certificate of incorporation was conclusive evidence of incorporation and could not be collaterally attacked, noting, p. 539:

". . . the rule preventing collateral attack on a corporate charter duly issued is very much analogous to that preventing inquiry into the procedures of a duly certified legislative enactment. Mikell v. Philadelphia School District, 359 Pa. 113, 58 A.2d 339 (1948)."

Plaintiffs seek to differentiate the Pennsylvania decisions from the case at bar. They say the Enrolled Bill Doctrine applies *only* to *procedural defects* in legislative procedure and not to alleged substantive violations of constitutional mandates. The following excerpt from Kilgore v. Magee, supra, is relied upon: (p. 412)

"The evidence of a law—*its actual existence*—we may inquire into; for before we are bound by it, we must be satisfied it is the act of the legislature, however informally they may have conducted the process by which they have made it a law."

We think further examination of this excerpt demonstrates that it is not controlling in this case, especially when considered with the two sentences which immediately precede it, viz.:

"If every law could be contested in the courts on the ground of informality in its enactment, the floodgate of litigation would be opened so widely, society would be deluged in the flow. It is not a question of fraud in which that is set up as a law which never was so in form or in fact, but a question of regularity in the conduct of those who have the power to enact the law, and who declare it to be such. . . ."

When thus considered, together with the positive language of the paragraph which precedes it, we are of the opinion that the excerpt does not require the court, under the circumstances in this case, to proceed further and determine how many members were present and voted for the bill. We believe the correct interpretation of the language in question is that the court may make inquiry into what is contained on the face of the document, or to determine, for example, which one of two purported Bills is genuine, as in the Franklin National Bank of Long Island case; or whether the signature of the Governor approving the bill or the authenticating signatures of the presiding officers of the House and Senate were forged; or whether after its passage the bill had been altered by designing persons or printer's error so as to have lost its original meaning. See State ex rel. Mayr, Secretary of State v. Marion Circuit Court, supra.

No such situation exists in the case at bar. Prima facie everything was done lawfully. There is no indication of fraud on the face of the bill nor, we repeat, was there any objection or allegation by any member of the House that the Speaker was deceived or acted fraudulently in certifying that the bill had received a constitutional majority.

## THE FEDERAL RULE

The decisions of the United States Supreme Court have sustained the Enrolled Bill Rule on the theory that the orderly administration of government and the Separation of Powers Doctrine require it.

The leading case in the Federal jurisdiction is Field v. Clark, 143 U. S. 649 (1892). In accord are United States v. Ballin, 144 U. S. 1 (1892) ; Harwood v. Wentworth, 162 U. S. 547, 562 (1896) ; Rainey v. United States, 232 U. S. 310, 317 (1914), White, C. J.; Leser v. Garnett, 258 U. S. 130 (1932), Brandeis, J.

In Field v. Clark the Supreme Court, speaking through Mr. Justice Harlan, said, pp. 672-673:

"The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, . . . And when *a bill, thus attested,* receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and *unimpeachable . . .* an enrolled act . . . carries, on its face, *a solemn assurance* by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. *The respect due* to coequal and independent departments *requires* the *judicial* department to act upon that assurance, and *to accept,* as having passed Congress, all bills authenticated in the manner stated: leaving the courts to determine, when the question properly arises, whether the Act, so authenticated, is in conformity with the Constitution."

"It is *admitted* that an enrolled act, thus authenticated, is sufficient evidence of itself—*nothing to the contrary appearing upon its face*—that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States if the *journal* of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be seriously considered in the *present* inquiry. *It suggests a deliberate conspiracy* to which the presiding officers, the committees on enrolled bills and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. *Judicial action* based upon such a suggestion is *forbidden* by the respect due to a coordinate branch of the government. The evils that may result from the recognition of the principle that an enrolled act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, *is conclusive evidence* that it was passed by Congress, according to the forms of the Constitution, *would be far less* than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them."

One of the strongest reasons advanced by the plaintiffs in their assault on the Enrolled Bill Rule is based on their claim that under the precedent-shattering decisions in Baker v. Carr, 369 U. S. 186

(1962) and Bond v. Floyd, 385 U. S. 116 (1966), State courts should no longer hesitate to "go behind an Act of the Legislature and determine whether the plaintiffs' *constitutionally* protected right not to be taxed by alleged illegally enacted laws has in fact been violated," citing Frick v. Pennsylvania, 268 U. S. 473 (1925).

Prior to Baker v. Carr the United States Supreme Court had refused to enter the "political thicket," as Mr. Justice Frankfurter termed it, in an earlier legislative apportionment case: Colegrove v. Green, 328 U. S. 549, at p. 556 (1946); because that issue was one "of a peculiarly political nature and therefore not meet for judicial determination." page 552.

". . . The Constitution has left the performance of many duties in our governmental scheme to depend on the *fidelity* of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights." page 556.

Following Colegrove v. Green, as plaintiffs aptly say in their brief, ". . . *times had changed.* And the *continued disregard* of the requirements of law *by the lawmakers themselves* caused the Supreme Court of the United States to reverse . . ." its previous decision. This indeed it did only sixteen years later in its epochal reapportionment decision in Baker v. Carr. There it was held that the Federal courts had jurisdiction to hear a petition to reapportion the Tennessee Legislature, that "The political question doctrine, a tool for maintenance of governmental order, will not be so applied as to promote only disorder" (p. 215) and that "The *courts cannot reject* as 'no law suit,' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." (p. 217) For a wide extension of the new rule and the one-man-one-vote doctrine see: Gray v. Sanders, 372 U. S. 368 (1963) ; Reynolds v. Sims, 377 U. S. 533

(1964); WMCA v. Lomenzo, 377 U. S. 633 (1964); Maryland Committee v. Tawes, 377 U. S. 656 (1964); Roman v. Sincock, 377 U. S. 695 (1964); Lucas v. Colorado General Assembly, 377 U. S. 713 (1964); Avery v. Midland County (Texas), 390 U. S. 474, 20 L. Ed. 2d 45 (1968).

In Lucas v. Colorado General Assembly, a State Constitutional Amendment adopting a legislative reapportionment plan was declared unconstitutional by the Supreme Court of the United States. Likewise in Avery v. Midland County, the Supreme Court struck down a Texas four-member County Commissioner Court because it was considered to be not constitutionally apportioned.

In Bond, petitioner had been elected to the Georgia Legislature but was excluded by the House of Representatives in the exercise of its power to judge the qualifications of its own members because he had criticized the Vietnam War in a manner the Legislature deemed treasonable. The Supreme Court of the United States, however, held that Bond's exclusion violated his constitutional right to freedom of speech and awarded him his seat, reversing the Supreme Court of Georgia.

It must be conceded that the doctrines laid down in Baker v. Carr and the apportionment cases which followed it, together with Bond v. Floyd, represent a formidable and revolutionary invasion of the separation of the powers doctrine and may portend further substantial erosion of its scope.[11]

On the other hand, in Baker v. Carr, supra, 369 U. S. 186 (1962), the United States Supreme Court appears to have reaffirmed its basic adherence to a

---

[11] Recently, the United States Supreme Court held that the House of Representatives has no power to exclude a member-elect who meets the Constitution's membership requirements: Powell v. McCormack, 395 U. S. 486.

modified form of the Enrolled Bill Rule. At page 214, Mr. Justice Brennan said:

"VALIDITY OF ENACTMENTS: In Coleman v. Miller, supra, this Court held that the questions of how long a proposed amendment to the Federal Constitution remained open to ratification, and what effect a prior rejection had on a subsequent ratification, were committed to congressional resolution and involved criteria of decision that necessarily escaped the judicial grasp. *Similar considerations apply to the enacting process:* 'The respect due to coequal and independent departments,' and the *need for finality and certainty* about the status of a statute contribute to judicial reluctance to inquire whether, as passed, it complied with all requisite formalities. Field v. Clark, 143 U. S. 649, 672, 676-677; see Leser v. Garnett, 258 U. S. 130, 137. *But it is not true that courts will never delve into a legislature's records* upon such a quest: If the enrolled statute lacks an effective date, a court will not hesitate to seek it in the legislative journals in order to preserve the enactment. Gardner v. The Collector, 6 Wall. 499. The political question doctrine, a tool for maintenance of governmental order, will not be so applied as to promote only disorder."

In Gardner, President Lincoln omitted the year 1861 when he endorsed a revenue bill: "Approved December 24": 73 U. S. (6 Wallace) 499, p. 500.

It should be borne in mind that the separation of powers doctrine is only one justification for the Enrolled Bill Rule. Other reasons given in support of the rule are: (a) an evidentiary problem which would otherwise exist involving, inter alia, the scope of the investigation, contradictory *oral* testimony and recollection of witnesses long after the event; (b) that the legislators are conclusively presumed not to violate their oath of office; (c) the potential flood of litigation if the courts are required to investigate and rule on

the legislative process in the passage of bills; (d) the uncertain and *chaotic* status of legislation affecting property rights and individual liberty, pending the final determination by the appellate courts of the State and the nation whether or not an Act of Assembly had been validly enacted.

In his able article: "Judicial Non-Enforcible Provisions of Constitutions," [12] Professor Walter F. Dodd asks: *"Would better or worse results come* from an *extension* of *judicial* control to cover the present field of judicial non-enforcibility?"* [13]

"When courts have assumed authority to decide issues involving political interests, they have not always inspired public confidence. It will always be remembered that the judicial members of the Electoral Commission of 1876 voted in accord with their political affiliations. A judicial effort to enforce the duty of state executives with respect to interstate rendition would almost of necessity have worked less well than a plan of placing that responsibility upon the executives themselves. Government is after all a political institution, and political problems are better solved outside the court room. If courts attempt their solution they fail and cripple themselves in the performance of functions properly judicial. At the same time they reduce the feeling of responsibility that should exist in the department charged with the power or duty to act.

". . . . The *growing tendency* to regard the *enrolled bill* as *final* has an element of distinct value, though *the rule may be pushed too far* when the

---

[12] 80 University of Penna. Law Rev. 54, at 92-93 (1931).

[13] In footnote 188 op. cit. at page 92 Dodd asserts:

"The suggestion that judicial power be extended to the field of political questions appears to assume that such an extention is desirable. Albertsworth, CONSTITUTIONAL DUTIES AND INADEQUATE ENFORCEMENT MACHINERY (1931), 17 A.B.A.J. 153."

courts defeat an effort to show that through fraud a measure has come to have the form of law although never enacted by the legislature. . . .

" 'We are much too apt to think of the judicial power of disregarding the acts of the other departments as our only protection against oppression and ruin.' The forces that compel compliance with political safeguards and with the essential requirements in the passage of laws and the adoption of constitutional changes are not judicial—they are stronger than this, and their strength is largely dependent upon the degree of final responsibility placed upon the political organs of government."

Whatever the future may hold in store for the Enrolled Bill Rule, we believe it is undoubtedly the law in Pennsylvania today. Consequently, this court is required to sustain the preliminary objections filed by defendant Secretary of Revenue to count I of plaintiffs' complaint in equity.

### COUNT II

In count II plaintiffs pray this court to enjoin and restrain defendant Secretary of Revenue and his deputy from enforcing any of the provisions of the "Tax Act of 1963 for Education," as amended, the Act of May 29, 1963, P. L. 49, 72 PS §3403-1, and to declare that act unconstitutional, null and void.

In their complaint plaintiffs aver:

"17. Said Tax Act of 1963 for Education, as amended, both in its form prior to January 1, 1968 imposing a tax at the rate of 5% and in its purported form subsequent to January 1, 1968, purportedly imposing a tax at the rate of 6%, is unconstitutional by virtue of Section 1 of Article IX of the Constitution of the Commonwealth of Pennsylvania providing that '*All taxes shall be uniform upon the same class of subjects* within the territorial limits of the authority levy-

ing the tax . . . .' in that although ostensibly a tax on tangible goods and services, by virtue of the all-pervasive nature of said tax requiring its payment for the very necessities of life by all taxpayers, whatever their station and whatever their way of life, *such tax is in fact a tax on income at varying rates*, which are in fact regressively graduated and which are not uniform upon the same class of subjects, to wit, taxpayers of the Commonwealth of Pennsylvania.

"18. Said Tax Act of 1963 for Education, as amended, in fact requires the payment by persons of lesser income, such as plaintiff Antonia Velasquez, whose income is approximately $3,600. per year, of a far greater percentage of their income in the form of taxes than by persons such as plaintiff Milton J. Shapp having greater income."

Plaintiffs contend that the act violates the Fourteenth Amendment to the Constitution of the United States and Article I, secs. 1 and 9 of the Constitution of Pennsylvania and that if construed so as to apply to plaintiffs, would result in their subjection to excessive and illegal taxation, which has resulted and will continue to result in a taking of their property without due process of law.

The defense of the Commonwealth's officers to count II is two fold:

First, that on the merits, the act in question is undoubtedly an excise tax imposed upon the sale or use of tangible personal property and merely paid from income.

Second, in view of the allegations of count II, the defense of laches is clearly applicable. Defendants assert that the Tax Act of 1963 for Education, as amended, is a reenactment of the Act of March 6, 1956, P. L. (1955) 1228, and that plaintiffs' present action raising the "lack of uniformity" issue was filed approximately 12 years thereafter, and that the basis

of plaintiffs' contention existed in March 1956 to the same extent as at present.

Defendants further aver that through the intervening years the Sales and Use Tax has become the Commonwealth's major revenue producer, that the budget of Pennsylvania is geared directly to the Act in question and "an adherence to the plaintiffs' position now would effectively put the Commonwealth out of business." Consequently, defendants claim plaintiffs should be estopped from challenging the constitutionality of the Act at this late date.

Article IX, sec. 1 of the Pennsylvania Constitution in relevant part provides that

"All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws . . ."

Plaintiffs' claim that the act in question violates the Uniformity Clause of the Pennsylvania Constitution appears to be based on the theory that the said sales tax act is in reality a tax on income at a graduated scale and therefore prohibited by the Constitution. Not a single case directly in point has been submitted by plaintiffs in support of this contention. They content themselves by quoting only one paragraph from Allentown School District Mercantile Tax Case, 370 Pa. 161 (1952), which sets forth generally what the Uniformity Clause of the Constitution requires in regard to taxation. At page 170, therein, it is stated:

"Uniformity requires substantial equality of tax burden: Com. v. Overholt & Co., Inc., 331 Pa. 182, 200 A. 849; Com. v. Repplier Coal Co., 348 Pa. 372, 35 A. 2d 319; Moore v. Pittsburgh School District, 338 Pa. 466, 13 A. 2d 29. While taxation is not a matter of exact science and perfect uniformity and absolute equality in taxation can rarely ever be attained (Wilson v. Philadelphia, 330 Pa. 350, 352, 198 A. 893), the

imposition of taxes which are to a substantial degree unequal in their operation or effect upon similar kinds of business or property, or upon persons in the same classification, is prohibited: . . ."

Plaintiffs fail to show that the fundamental constitutional principle quoted prohibits the Legislature from enacting the tax in question. It may well be that the reason for this is that there appear to be no cases supporting plaintiffs' contention. Defendants in their brief assert:

"Commerce Clearing House notes in its All State Sales Tax Reporter that sales taxes are collected in 44 states plus the District of Columbia and on a national basis constitute the most important single source of state revenues. In fiscal 1967, sales taxes were the top state tax revenue source and the best source of revenue in 31 states. The Commonwealth submits that *in none of these other jurisdictions* has such a claim as is presently before this Court been considered, let alone validated. . . . ."

And defendants further assert that

". . . . The Act in question is an excise tax imposed on the sale and use of tangible personal property within the Commonwealth of Pennsylvania at uniform rates. The claim of 'lack of uniformity' is often made in regard to tax statutes but seldom sustained by the courts. . . . ."

They also call attention to Commonwealth v. Life Assurance Co. of Pa., 419 Pa. 370 (1965),[14] which is a comprehensive and definitive opinion on the presumptions and burdens in this general area of the law but does not deal with the specific question before us.

In Welsh, Governor v. Sells, supra, 192 N. E. 2d 753 (1963, Indiana), the constitutionality of the Indiana Sales and Use Tax was sustained in the face of many

[14] Affirming 83 Dauph. 93 (1964) Swope, J.

attacks, none of which, however, included the one here presented.

It may be observed in passing that the Commonwealth of Pennsylvania presently imposes two State taxes which contain the word "income" in the title, viz., the Corporate Net Income Tax Act, the Act of May 16, 1935, P. L. 208, reenacted and amended on December 27, 1951, P. L. 1746, 72 PS §3420a, et seq., and the Corporation Income Tax Law of August 24, 1951, P. L. 1417, 72 PS §3420n-1, et seq. Although the word "income" appears in the title, these acts have constantly been interpreted *not* as involving "income" taxes per se but as either an excise tax for the privilege of doing business in the Commonwealth, measured by income, or a property tax measured by income. Thus, even in these cases the Courts have consistently refused to apply the "income tax" label.

Plaintiffs' contention that the sales Tax Act of 1963 for Education, as amended, is unconstitutional, is based on the premise that the tax imposed is paid out of income and capital. Defendants assert, to the contrary, that "every tax imposed by any governmental body regardless of its title or impositions is paid out of income and capital. Under plaintiffs' reasoning all taxes would be income taxes."

Each case interpreting the various ramifications of the act in question has been based on the principle that the act is an excise tax imposed on the sale or use of tangible personal property within the Commonwealth. We think that merely because such tax is paid out of the taxpayer's income does not make it an income tax. See Banger's Appeal, 109 Pa. 79, wherein the court in discussing the nature of an occupation tax, stated, p. 95:

". . . An 'occupation' tax is peculiar in its character. It is not a tax upon property, but upon the pursuit which a man follows in order to acquire property and

support his family. It is a tax upon income in the sense *only* that every other tax is a tax upon income; that is to say, it reduces a man's clear income by the precise amount of the tax. But it is an income tax in no sense. . . ."

It is clear that a *graduated* tax upon the entire net income of individuals violates the Uniformity Clause of the Constitution of Pennsylvania: Kelley v. Kalodner, Secy. of Revenue, 320 Pa. 180 (1935). This case was cited with approval in Saulsbury v. Bethlehem Steel Co., 413 Pa. 316, at p. 319, where the court stated:

". . . In Kelley v. Kalodner, 320 Pa. 180, 181 A. 598 (1935), we ruled that a statute levying an income tax from which certain individuals were exempted because their incomes did not exceed stated amounts was void, in that it was lacking in uniformity and violated the constitutional rule."

On the other hand, in Turco Paint and Varnish Co. v. Kalodner, Secy. of Revenue, 320 Pa. 421 (1936), it was decided that a *nongraduated tax* based upon income does *not* violate the Uniformity Clause and the fact that the actual amount of taxes paid varies from taxpayer to taxpayer is irrelevant. At page 426, the court held:

"Plaintiff has not pointed to a single provision of the act which would demonstrate a legislative intent to impose a graded income tax. The rate used, 6%, is the same for *all* corporations. The tax *base* to which this rate is to be applied is *also identical*. It is the net income attributable to this State. It certainly should be axiomatic that the same impost when applied to the same matter does *not* make the tax graded simply because of the fact that one association, owning more of the particular taxable subject-matter than another, *pays*, on this account, *a greater sum* total of tax. Where *different* rates are legislatively imposed on

varying amounts or quantities of the *same* tax base, then you have a graded tax that lacks uniformity under our Constitution. See Kelley v. Kalodner, 320 Pa. 180. . . ."

The burden of convincing the court that an act of the General Assembly is unconstitutional is a very heavy one and rests squarely upon plaintiffs.

". . . It is axiomatic that he who asks to have a law declared unconstitutional takes upon himself the burden of proving beyond all doubt that it is so. This, of course, means that the legislature is presumed not only to have put the true interpretation on the Constitution, but also to have understood the facts of the particular case, and that it did not wilfully disregard either. All presumptions are in favor of the constitutionality of acts and courts are not to be astute in finding or sustaining objections to them: (citing cases)": Hadley's Case 336 Pa. 100, at 104 (1939).

What was said by the late President Judge Keller in the minority opinion of the Superior Court in Rohrer v. Milk Control Board, 121 Pa. Superior Ct. 281, 313, which was adopted by the Supreme Court of Pennsylvania, 322 Pa. 257, 259, 281 (1936), is appropriate here:

"And, as respects State legislation, in order to declare an Act of the General Assembly unconstitutional, its want of authority to pass the act must clearly appear,—to doubt is to decide in favor of its constitutionality: Com. v. Lukens, 312 Pa. 220, 223, 167 A. 167; Keator v. Lackawanna Co., 292 Pa. 269, 273, 141 A. 37; Kitty Roup's Case, 81 Pa. 211."

More recent decisions reaffirming the doctrine that all presumptions are in favor of the validity of a statute are: Commonwealth v. Life Assurance Co. of Pa., supra, 419 Pa. 370, 377, 389 (1965), Chartiers Valley Jt. Schools v. Allegheny County Bd. of School Direc-

tors, 418 Pa. 520, 546, and Milk ·Control Commission v. Battista, 413 Pa. 652, 659.

In the instant case we are of the opinion that plaintiff has failed to meet the burden of showing that the Tax Act of 1963 for Education, as amended, is unconstitutional and void. For the foregoing reasons, defendants' demurrer to count II of the complaint must be sustained. Under these circumstances it is not necessary to consider the additional defense of laches.

And now, February 27, 1969, defendants' preliminary objections to count I and their demurrer to count II of plaintiffs' complaint in equity are sustained and the said complaint is dismissed at the cost of plaintiffs.